**SIOUX QUALITY PACKERS, DIVISION OF ARMOUR AND COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1968.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1978.

Decided July 18, 1978.

---

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

154

Michael T. Gallagher of Thoma, Schoenthal, David Hockenberg & Wine, argued, and Leon R. Shearer, Des Moines, Iowa, on brief, for petitioner.

Elinor H. Stillman, Atty., N. L. R. B., Washington, D. C., argued, and Morton Nanrow, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief, for respondent.

Before LAY, HEANEY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Sioux Quality Packers (the employer) petitions this court to review an order of the National Labor Relations Board (the Board), which determined that the employer had discharged Eugene Means, reinstated him without back pay and later discharged him again for reasons violative of sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(3) and (1). The Board cross-applies for enforcement of its order. Because substantial evidence on the record as a whole does not support the Board's conclusion that the later discharge was motivated, at least in part, by an impermissible consideration of Means' union activities, we decline to enforce the Board's order.

I.

Sioux Quality Packers, a division of Armour and Company, is in the meat packing business and operates a plant for that purpose in Sioux City, Iowa. Eugene Means was hired by the company in 1969 and, at the time of his final discharge in 1975, worked in the hog kill department. Means was a member of the Amalgamated Meat Cutters and Butcher Workmen of North America, Local P–1142 and served as a union steward from 1972–75.

In his trial testimony, Means characterized himself as being somewhat less than a model employee. His more notable shortcomings included a high incidence of absenteeism, tardiness, and leaving his work station without permission. For the latter reason Means was given three written warnings over a two month period in late 1972. The second of these warnings was accompanied by a two week suspension and the third resulted in Means being indefinitely suspended. Means was reinstated through intercession of the union in 1973.

As a union steward, Means was ambitious in his representation of employees' grievances. The trial examiner found, and the evidence supports the conclusion, that because of Means' willingness to "go to bat" for other employees, he was disliked by some members of management, who considered him to be a troublemaker.

On the morning of October 8, 1974, following an absence due to illness, Means reported to work at the plant. He went to the place where work assignments are made and waited with other employees to be given an assignment. His foreman, Eugene Huls, assigned jobs to the other waiting employees but said nothing to Means. Instead, Huls, along with personnel supervisor Robert Dather, watched Means to see how long it would be before Means actively requested an assignment. After approximately ninety minutes, failing Means' request, Huls informed Means that he was being suspended for not reporting to work. On October 10, it was announced that Means was being discharged. On December 30, 1974, Means was reinstated, but without back pay.

Means was again discharged in May of 1975 following an incident culminating in Means leaving his work station in the face of a direct order to remain. The employer had a plant rule requiring all employees to stay at their work stations until a "spell-out" or relief man could replace him. In emergency situations, a foreman would take over the workman's duties until the spell-out man arrived.

On May 6, Means was at his assigned position along the hog kill line. Together with a co-worker, Means felt a need to use the rest room. They summoned foreman Huls, who refused to declare the situation an emergency and told the two men they would have to wait for the spell-out man. Following a brief but heated discussion, Means' co-worker requested the presence of the chief plant steward, Ed Jeffers. Jeffers and Huls returned several minutes later accompanied by the chief departmental steward, Javier Fuentes. When Means' request for emergency relief was again denied, he walked off the job. The spell-out man arrived several minutes later and relieved Means' co-worker.

Approximately thirty minutes later, after Means had returned to his work, foreman Huls informed Means that he was being indefinitely suspended for walking off the

job without permission. The next day, after considering Means' behavior on May 6 in light of his poor overall work record, it was decided that Means should be discharged.

## II.

Means filed unfair labor practice charges against the employer in November 1974 regarding his discharge in October of that year; a second set of charges concerning his discharge in May 1975 was filed in November of 1975. Means charged in essence that his discharge in each instance was motivated by union animus on the part of the employer, in violation of sections 8(a)(3) and (1) of the Act. The Regional Director issued a consolidated complaint against the employer in June of 1976, incorporating the allegations of both sets of charges.

Following a trial on the merits, the administrative law judge (ALJ) concluded that the October discharge was not in reality a reaction to Means' failure to request a work assignment, but the result of a deliberate attempt on the part of Huls and Dather to maneuver Means out of his job. The ALJ determined that this action was motivated by Huls' distaste for Means' union activism. The employer apparently did not seriously dispute that conclusion on appeal before the Board and does not dispute it here.[1]

The general counsel contended that the May discharge represented more of the same discriminatory treatment of Means. The ALJ rejected that argument, concluding that "even an employer with animus toward a union activist is not by that circumstance deprived of the power to discharge for cause." Finding Means' insubordination of May 6 to be real and his overall work record to be poor, the ALJ resolved the testimonial conflicts in favor of the employer and determined that Means' final discharge was motivated, not by union animus, but by "an honest, nondiscriminatory business judgment."

The Board disagreed with this latter conclusion of the administrative law judge. It found that Means' discharge was based upon a consideration of Means' entire work record, which record included a notation concerning the October discharge and that, because the earlier discharge was unlawful and because it was considered, the later discharge must be unlawful also. The Board's resolution of this issue was stated as follows:

> Respondent informed Means that the decision to convert the suspension [into] a discharge was based not only upon his actions of May 6, but also upon his "poor overall work record." Respondent admits that Means' overall work record includes his previous discharge. As we have found the first discharge to be unlawful, the second discharge, based in part upon the first unlawful discharge is, a fortiori, also unlawful. We so find.

We find this conclusion of the Board to be unsupported by substantial evidence on the record as a whole.

## III.

In language often repeated, the Supreme Court has said that "[t]he Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them." *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). Nor does the Act give to the Board any supervisory authority to substitute its judgment for that of the employer in making such decisions. *NLRB v. Prescott Industrial Products Co.,* 500 F.2d 6, 11 (8th Cir. 1974); *NLRB v. Red Top, Inc.,* 455 F.2d 721, 726 (8th Cir. 1972). The fact that the Board disagrees with an action by the employer is of no importance. Instead, what the Act purports to do is simply to withdraw a range of factors from the employer's consideration when exercising his otherwise unfettered discretion to discharge an unwanted employee. In short, sections 8(a)(3) and (1) require that an employer not terminate an employee out of hostility toward the latter's union activities. The question

---

1. For this violation the Board ordered that Means be given back pay from the time of his discharge in October through the time of his reinstatement in December plus the posting of appropriate notices by the employer.

before us, therefore, concerns the motivation, and not the merit, of Means' dismissal.

■ The burden of proving that a discharge was unlawfully motivated is, of course, upon the Board. *Independent Gravel Co. v. NLRB*, 566 F.2d 1091, 1094 (8th Cir. 1977); *Broadway Motors Ford, Inc. v. NLRB*, 395 F.2d 337, 340 (8th Cir. 1968). A finding of discrimination by the Board must be supported by substantial evidence; it may not rest upon flimsy evidence, mere inference or guesswork. *Independent Gravel Co. v. NLRB, supra,* 566 F.2d at 1094. Finally, "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *NLRB v. Red Top, Inc., supra,* 455 F.2d at 725; *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Measured against these well-established principles, the Board's conclusion in this case was in error. There was no finding that any of Means' past reprimands, save the October discharge, were either unwarranted or pretextual. On the contrary, Means testified quite candidly that he was aware of the fact that his absences and tardiness, for instance, were considered excessive and that such behavior might be cause for disciplinary measures. Further, it is clear that Means was not engaged in any protected conduct contemporaneous with his suspension and discharge in May, which circumstance has sometimes given rise to an inference of union animus. Finally, the administrative law judge found as a fact that Means' discharge was motivated by a good faith business judgment and not by union hostility; he specifically addressed and rejected the argument that the October discharge, or the ill feelings behind it, were at the bottom of the discharge in May.

The Board's contrary conclusion, on the other hand, is based solely upon the surmise that because Means had been unlawfully discharged once before, any subsequent discharge must, "a fortiori," be similarly motivated. We do not believe that this is evidence of substance. While a finding of past discrimination may be of some relevance in assessing a present action, the same does not assume the dignity of a conclusive presumption. It simply does not follow that because the October discharge was represented by a notation on Means' work record, and because management looked at his entire record before making a decision, that the same hidden motives which invalidated the earlier action should automatically arise to taint either prior or later decisions.

Accordingly, we decline to enforce so much of the Board's order as affords relief for the May discharge; that portion of the Board's order that grants relief for the October discharge shall be enforced. Costs shall be assessed to the Board.