CARTWRIGHT HARDWARE COMPA-
NY, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 77–1425.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 28, 1978.

Decided June 18, 1979.

Peter J. Adang of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., for petitioner.

Edward S. Dorsey, Washington, D. C. (with Elinor Hadley Stillman, Linda Eugenie Auerbach, John S. Irving, John E. Higgins, Jr., Carl L. Taylor and Elliott Moore, Washington, D. C., on the brief), for respondent.

Before McWILLIAMS, McKAY and LOGAN, Circuit Judges.

McKAY, Circuit Judge.

We are asked to set aside an order of the National Labor Relations Board (NLRB) which seeks to remedy certain violations of the National Labor Relations Act (the Act) committed by Cartwright Hardware, Inc. (Cartwright).[1] The NLRB has cross-applied for enforcement of the order. We have determined that the order should be set aside in part, but otherwise should be granted enforcement.

For thirty years Cartwright had been a nonmember signatory to labor agreements negotiated between the Mechanical Contractors Association of New Mexico and Local 412 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (the Union). By letter dated January 28, 1976, William Loomis, the president of Cartwright, noti-fied the Union "that as of April 1, 1976, we will no longer operate a union shop and we wish to terminate the labor agreement between us and Local Union # 412 as of March 31, 1976." Record, vol. 2, at 460. Loomis drafted the letter in compliance with the requirement of the existing agreement that either party wishing to terminate give sixty days notice of cancellation. The Union did not respond to the letter or to subsequent attempts by Cartwright employees to have Union leaders discuss the impending contract termination.

In mid-March, without having had a response from the Union, Loomis prepared a proposed schedule of wages and fringe benefits for the period following the anticipated expiration of the collective bargaining agreement. The employees were apprised of the proposed schedule by direct contact with management personnel. Cartwright managers also initiated inquiries among the employees as to which of them would be willing to work after contract expiration. In addition, Cartwright began to interview prospective replacements for employees unwilling to continue working.

On March 30, Union leaders visited Loomis to seek his signature on a new contract which had been negotiated with the Mechanical Contractors Association. Loomis informed the Union that he was not ready to sign the contract and referred to his disappointment with the Union's performance in providing qualified plumbers for Cartwright employment under the contract's hiring hall policy. The following day Union representatives suggested a thirty day "extension" of the contract to provide time for the negotiation of differences. Loomis indicated he would consider the proposal, but informed his employees of its rejection on April 1. The Union steward then asked for paychecks for all affected employees.

Unfair labor practice charges were swiftly filed against Cartwright. In the decision

---

1. The NLRB identified violations of section 8(a)(1), (3) and (5) of the Act. 29 U.S.C. § 158(a)(1), (3) and (5) (1976).

accompanying the order under review, the NLRB determined that Cartwright had committed unfair labor practices by refusing to bargain with the Union, by withdrawing recognition from it, by constructively discharging three members of the Union, by bargaining directly with its employees, and by unilaterally changing terms and conditions of employment. In reaching these determinations, the NLRB rejected the conclusions of its administrative law judge on all but the final unfair labor practice charge. Cartwright contends that each of the NLRB's findings lacks substantial support in the record.[2]

■ The fact findings of the NLRB are conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f) (1976). In discussing this review standard, the Supreme Court has instructed: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Evidence may properly be considered less substantial when the NLRB's administrative law judge, "who has observed the witnesses and lived with the case," has drawn conclusions different from those reached by the NLRB. *Id.* at 496, 71 S.Ct. at 469. It is with these principles in mind that we have reviewed the record in this case.

■ We have concluded that there is substantial evidence in the record as a whole to sustain the NLRB's findings of fact regarding Cartwright's refusal to bargain with the Union,[3] its direct bargaining with employees, its unilateral institution of changed terms and conditions of employment, and its withdrawal of recognition from the Union.[4] In addition, we have concluded that the relevant legal doctrines support the NLRB's determinations respecting these issues.

We have had more difficulty with the NLRB's conclusion that Cartwright constructively discharged three employees in violation of the Act. After careful scrutiny of the record and reference to appropriate authorities, we have decided that this determination was erroneous.

■ Section 8(a)(3) of the National Labor Relations Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1976). A constructive discharge is found when an employer makes working conditions so intolerable as to force an employee to resign. Such a forced resignation is a violation of section 8(a)(3) when it has been induced to discourage union activity or membership. A constructive discharge in violation of section 8(a)(3) thus comprehends at least two distinct elements: (1) An employer's motivation to discourage union activity or membership; and (2) an employee's resignation prompted by employer-created intolerable conditions. *See, e.g., J. P. Stevens & Co. v. N. L. R. B.*, 461 F.2d 490, 494 (4th Cir. 1972); *N. L. R. B. v. Holly Bra of California, Inc.*, 405 F.2d 870, 872 (9th

---

2. Cartwright also complains that the NLRB departed from its own rules regarding appeals from administrative law judge decisions and that this departure should justify a reversal of the NLRB. We are not persuaded by Cartwright's contentions on this issue.

3. Although we are not persuaded that Cartwright's behavior prior to March 31 supports a conclusion of a refusal to bargain, we find no reason to reject the NLRB's general finding on this charge. Cartwright contends that the Union's offer to bargain was unlawfully conditioned on a thirty day extension of the old agreement. We do not believe the record supports this contention. William Loomis' testimony does not suggest that he regarded the Union's offer as conditional. Indeed, Loomis denied that the Union had asked him to extend the old contract. Loomis reported that he declined to negotiate for an additional thirty days because he thought such negotiations would be unproductive. Record, vol. 1, at 37–39, 52.

4. The NLRB has not been particularly clear regarding its theory of how Cartwright withdrew recognition from the Union. We nonetheless believe that the evidence of unilateral dealings and refusal to bargain with the Union provides sufficient support for the conclusion that Cartwright implicitly withdrew recognition.

Cir. 1969); *N. L. R. B. v. Brennan's, Inc.*, 368 F.2d 1004 (5th Cir.) (per curiam), *modifying* 366 F.2d 560 (5th Cir. 1966). A constructive discharge in violation of the Act can be found, for example, when an employer informs his employees that they must choose between union activity and continued employment, and employees faced with this "choice" decide to terminate their employment. *E.g., American Enterprises, Inc.*, 191 N.L.R.B. 866, 868–69 (1971). A constructive discharge may also arise when an employer seeks to establish an environment in which employees are required to work without the benefit of rights guaranteed them under the Act. If employees resign rather than work in such an environment, they may properly be considered constructively discharged. *See, e. g., Superior Sprinkler, Inc.*, 227 N.L.R.B. 204 (1976); *Marquis Elevator Co.*, 217 N.L. R.B. 461 (1975).

It appears that the NLRB has stated its theory of unlawful constructive discharge to be within the parameters of the cases just referred to:

> [B]y requiring its employees to accept unilaterally imposed changes in wages and other working conditions and by repudiating its bargaining obligations in violation of Section 8(a)(5) and (1), Respondent created a situation which made it impossible for its plumbers to continue in the Company's employ and retain their union membership. We therefore find . . . that Respondent constructively discharged employees Schwanke, Lovato, and Saiz in violation of Section 8(a)(3).

Record, vol. 3, at 543, 546 (footnotes omitted). The NLRB's theory is essentially sound. The problem is that it lacks substantial support in the record. We do not believe the record as a whole contains substantial evidence that the three employees resigned because Cartwright had created "impossible" conditions. Neither does it demonstrate that Cartwright was motivated by antiunion animus to establish conditions designed to force his union employees to abandon the Union or their jobs. Given this state of the record, it cannot be concluded that the employees were constructively discharged in violation of section 8(a)(3) of the Act.

We first consider what the record reveals regarding the reasons why the union employees quit. It should be noted at the outset that the evidence does not support a finding that Cartwright managers told the employees that only nonunion workers could remain on the payroll after contract expiration. Neither does the evidence indicate that the employees quit because Cartwright sought unilaterally to impose a changed wage scale, or because Cartwright had refused to negotiate. Rather, it appears that most [5] of the union members quit because they believed they could not work in an open shop without sacrificing their union memberships. But this circumstance did not arise because of some action by Cartwright. It arose because of the employees' perception, buttressed by discussions with union leaders, that a "secret" provision of the Union's bylaws mandated a choice between continued employment and union membership.[6] Record, vol. 1, at 213–15, 277–78, 290, 300, 306, 319, 320–21.

---

**5.** There is considerable evidence in the record that two of the employees alleged to have been constructively discharged resigned for wholly unprotected reasons. There was testimony that Arthur Saiz had said he was going to quit regardless of what Cartwright did with respect to extending the old agreement. Record, vol. 1, at 333, 341. Edson Lovato had expressed an interest in resigning to go fishing and to collect unemployment compensation. *Id.* at 274, 276. All this testimony was credited by the administrative law judge, who also specifically found that Lovato's characterization of his comment as a joke was not credible. Record, vol. 3, at 505 & n.20. This evidence, of course, weakens the NLRB's position that the workers resigned because they had been placed in intolerable circumstances.

**6.** The relevant provision of the bylaws, section 213, was quoted in the opinion of the administrative law judge as follows:

(a) A member shall not work contrary to or in violation of the terms and conditions of any collective-bargaining agreement entered into either by a local union or the United Association.

(b) No member may be employed in an industrial plant on any work, whether it be construction, maintenance or moderization

■ Our basic concern can be simply expressed. It is not disputed that an employer may lawfully permit a collective bargaining agreement to terminate upon normal expiration. Neither is it disputed that a union shop provision does not survive contract termination. *See, e.g., N. L. R. B. v. Cone Mills Corp.,* 373 F.2d 595, 598 (4th Cir. 1967). Suppose, however, that certain union employees are subject to a union bylaw provision making it impermissible for them to work in an open shop. Further suppose that the employer knows of this bylaw prohibition. Would it be sensible to charge the employer with constructively discharging his union employees merely because he elected an open shop arrangement upon normal contract termination? We think not. Absent evidence of antiunion animus and a precipitating separate unfair practice, a finding of constructive discharge in this situation would be nonsensical.

■ Although the present case is distinguishable from our hypothetical, in its essential aspect it is the same. That is, although other unfair labor practices clouded the horizon, it is apparent that these did not precipitate the employees' terminations.[7] The most that can be said is that the union members quit because of the bylaw provision—something over which Cartwright had no control.

Of course, Cartwright did have control over its intentions to allow the union shop provision to lapse. It is therefore relevant to inquire whether Cartwright was motivated by antiunion animus in creating the situation complained of. That is, did Cartwright inaugurate an open shop arrangement for the purpose of using the bylaw provision to force employee rejection of the Union? The NLRB's opinion suggests, in vague terms, that this was Cartwright's intention. The opinion states that Cartwright's actions were "unlawfully designed" to create a Hobson's choice between union membership and continued employment. Record, vol. 3, at 543. In contrast to this suggestion, the administrative law judge found a "total absence of any antiunion animus" on Cartwright's behalf, and refused to attribute to the employer the cessation of work resulting from the mandate of the Union's bylaw provision. Record, vol. 3, at 505–06. Our review of the record causes us to agree with the administrative law judge.

We acknowledge the existence of testimony in the record indicating that Cartwright managers believed that the situation on April 1 would cause union employees to choose between Cartwright and the Union. The explanation for this, however, is not

[sic], that comes within the work jurisdiction of the United Association where the *Local Union does not have a collective-bargaining agreement with the industrial plant* or where the wage rate and terms and conditions of employment in the plant are less than the standard established in the Local Union's agreement, unless the member has, prior to employment in such a plant, obtained the consent of the Local Union Executive Board. (c) A member violating this section shall be disciplined under Section 218 by fine, suspension or expulsion. Local unions failing to comply with this section shall be disciplined as provided by Sections 95 and 96.
Record, vol. 3, at 505 n.19 (emphasis in the administrative law judge's opinion).

Inasmuch as a union shop clause was apparently standard in the collective bargaining agreement, an industrial plant operating on an open shop basis without an agreement would present problems for union members under subsections (a) and (b) of section 213.

It is noteworthy that subsection (b) allows the Union to consent to member employment

in industrial plants operating without collective bargaining agreements.

7. In *Superior Sprinkler*, by contrast, the employer's unlawful refusal to bargain with or recognize the union precipitated the employees' termination. These actions of the employer were held to create an environment in which employees would be required to work without the benefit of a right guaranteed them by the Act—i.e., the right to bargain collectively through representatives of their own choosing. Forcing employees to choose between working in this environment or quitting constituted an unlawful constructive discharge when the employees opted for the latter. 227 N.L.R.B. at 209–10.

Implicit in the *Superior Sprinkler* analysis is a causal connection between the unfair labor practice environment and the employees' resignations. Absent such a nexus, as in this case, the terminations could not have violated section 8(a)(3).

sinister. The managers had simply accepted at face value what the union members had told them about the bylaw prohibition. But this information came only after Cartwright had begun to explore the possibility of an open shop arrangement. There is no evidence at all that Cartwright knew of the bylaw provision prior to the drafting of the January 28 letter. It was a "secret" provision.[8] Neither is there any evidence that Cartwright pursued the open shop possibility as a means of forcing its union employees to quit. The evidence is overwhelming that Cartwright desired an open shop in order to facilitate the hiring of competent plumbers—plumbers unlike many the Union had provided. Record, vol. 1, at 91, 282–83, 336. The NLRB does not question the existence of this motivation. Neither does it challenge the credibility findings of the administrative law judge which support its existence. Record, vol. 3, at 494 n. 3. We do not believe that there is substantial evidence in the record as a whole to support the contrary inference drawn by the NLRB. Cartwright's motives in allowing the union shop arrangement to lapse were not unlawful.

After reviewing the record, we have concluded that the NLRB's determination of unlawful constructive discharge was erroneous. We therefore deny enforcement of the NLRB's order to this extent. Specifically, we do not enforce that portion of the NLRB's order requiring Cartwright to offer reinstatement and lost earnings to Jack Schwanke, Arthur Saiz, and Edson Lovato. In other respects, the order of the NLRB will be enforced.[9]

---

8. The record in fact suggests that William Loomis became quite upset when the secret status of the provision was revealed to him. Record, vol. I, at 340.

9. Although three of the Union's members have voluntarily left employment at Cartwright, it is not inappropriate to direct Cartwright to bargain with the Union. The presumption of continued support for the Union in the bargaining unit justifies enforcement of the NLRB's order. This presumption is augmented in this case by the return to work of two acknowledged union members: Clyde Phillips and G. W. Patty, Jr.