**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FIRST NATIONAL BANK OF PUEBLO, Respondent.**

Nos. 79–1182, 79–1205.

United States Court of Appeals, Tenth Circuit.

Argued May 7, 1980.

Decided June 20, 1980.

Paul J. Spielberg, Washington, D. C. (John D. Burgoyne, Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on the brief), for petitioner.

John A. Criswell, Englewood, Colo. (Anthony Gary Bell, Jr. of Criswell & Patterson, Englewood, Colo., and William F. Mattoon, Pueblo, Colo., with him on the brief), for respondent.

Before BARRETT, SEYMOUR and PECK *, Circuit Judges.

BARRETT, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order issued against First National Bank of Pueblo (Bank).

Board initially charged Bank with two unfair labor practices, i. e., interfering with, restraining, and coercing Joseph F. McGee, a representative of the Office and Professional Employees International Union (OPEIU) while he was engaged in distributing union literature in a public place to Bank's employees, and discriminating against Judy Whorton, a Bank employee, by terminating her because of her activities on behalf of OPEIU as an observer at an NLRB union representation election held at Bank on May 4, 1977.

Within a formal complaint filed on August 30, 1977, as amended on September 23, 1977, Board charged: (1) the holding company which owned Bank had threatened employees by stating it would not agree to any union contract and that it would sell Bank if its employees selected a union to represent them; (2) Bank violated the National Labor Relations Act (Act) by interfering with the solicitation of employees by Joseph McGee, an OPEIU representative; (3) Bank had violated the Act by discharging Judy Whorton because of her activities on behalf of OPEIU.

An administrative hearing was held on December 6, 1977, during the course of which Board called Frank B. Martinez, Assistant Vice President of Bank, Joseph McGee, a representative of OPEIU, Judy Whorton, Bank's former employee, and Charles Bunce, Jr., Cashier at Bank. Bank called J. Robert Armstrong, President of Bank, and Jim Hadley, Administrative Assistant in the Trust Department of Bank.

On March 3, 1978, the Administrative Law Judge (ALJ) entered a decision dismissing the Board's complaint in its entirety. With respect to Board's allegation that the bank holding company which owned Bank would not have a unionized bank or agree to any union contract, the ALJ found, *inter alia*:

As set forth above, Whorton testified that Armstrong made a number of coercive remarks concerning union activity at the April 26 meeting. Armstrong flatly denied making those remarks and his testimony was corroborated by Hadley. None of those witnesses were completely disinterested. Whorton is an alleged discriminatee. The animus stemming from the remarks attributed to Armstrong could help her establish that she was fired in violation of the Act. Armstrong, as president of Respondent, also has an interest in the outcome of this case. Hadley, as a leader of the committee

against the Union, could hardly be called disinterested. Under these circumstances, a credibility determination would have been made much simpler if additional witnesses had been called on the matter. Armstrong had meetings in all of the bank's departments. He spoke to more than 100 employees in the various meetings. Eight other employees were present at the very meeting to which Whorton testified. However, General Counsel called no witness to corroborate Whorton's testimony. Credibility can never be determined by merely counting the number of witnesses on each side, but Hadley's corroboration of Armstrong's testimony cannot be ignored. While giving weight to the possibility that Hadley might have been biased, his testimony was straightforward and quite believable. I credit Armstrong and Hadley rather than Whorton and find that the General Counsel has not established by a preponderance of the credible evidence that Armstrong made the unlawful remarks alleged in paragraphs V(a), (b) and (c) of the complaint.

[R., Vol. III, at p. 207].

With respect to Board's allegation that Bank had violated the Act by interfering with the solicitation of employees by Joseph McGee, an OPEIU representative, the ALJ found, *inter alia*:

Employees have the right to receive information from a union and an employer can interfere with that right only in very limited circumstances where a lawful no-solicitation rule is applied. An employer cannot lawfully interfere with such communication when it takes place in a public street and where it does not interfere with ingress or egress from his establishment. However, the General Counsel has not established that the right of any employee to receive information from the Union was infringed. Johnston's concern was with the distribution of handbills to customers rather than employees. There is no showing that the one handbill that Johnston took was being given to an employee. McGee may have felt threatened by Johnston's

"hovering over" him, but it was a transient incident that had no meaningful impact. McGee called the police and received assurances that things should be all right. The entire incident involved a petty, momentary squabble which arose from Johnston's belief that McGee was handing out circulars to customers. I find that the General Counsel has not established by a preponderance of the credible evidence that Armstrong and Johnston unlawfully interfered with McGee in his lawful solicitation of employees [sic] support as alleged in paragraph V(d) of the complaint.

[R., Vol. III, at pp. 208–209].

With respect to Board's allegation that Bank violated the Act by discharging Judy Whorton because of her activities on behalf of OPEIU, the ALJ found, *inter alia*:

On Saturday, July 16, 1977, Whorton learned that her grandfather died. A few hours later she called her immediate supervisor, Lessar, at Lessar's home. Whorton said that her gransfather [sic] had died and she wanted to know what Respondent's funeral policy was concerning whether her grandfather was considered immediate family and how many days off she would receive as funeral leave. Lessar said that she did not know but that she would check the handbook and call back Monday morning before Whorton came to work.

About an hour after Whorton spoke to Lessar on July 16, 1977, Whorton learned that the grandfather of a friend of hers had died and that his funeral would be the following Monday, July 18, 1977.

At 7:10 a. m. on Monday, July 18, Lessar called Whorton on the telephone and read to her the section of Respondent's handbook relating to funeral leave.[12]

[12] The relevant sections of that handbook read:

One day off, with pay, will be granted for death of other relatives.

Other relatives shall consist of any relative not included in the immediate family such as grandparents. . . .

For the death of a close friend you may take paid time off under our Personal Time-Off Policy or Vacation time.

Whorton said: "In other words, I would only have one day off for my grandfather's funeral" and Lessar answered in the affirmative. Whorton told Lessar that she needed Thursday off for the funeral and Lessar replied, "Yes, you have it." Whorton then said, "I would like to inform you that I will not be able to work today." Lessar asked the reason and Whorton replied that she had a funeral to attend that day. When Lessar asked who it was, Whorton replied that it was not a relative but that it was someone she felt very close to. Lessar asked whether Whorton had any personal time accumulated so that she could be paid. Whorton replied that she did not and that she would take it without pay, but that she wanted to let Lessar know that she would not be there. Lessar said, "okay." [13]

[13] The above findings are based on the credible testimony of Whorton. As explained above, Lessar was unavailable to testify through the fault of none of the parties. . .

\* · \* \* \* \* \*

On Tuesday, July 19, 1977, when Whorton reported for work, Martinez spoke to her. Martinez asked why she had not been to work the previous day. She replied that she had a funeral to attend and explained the circumstances. Martinez asked why she took the full day off for her friend's funeral and Whorton replied that she thought employees received the full day off for a friend's funeral. Martinez said that the only time an employee could take time off for a friend's funeral was when the employee had accumulated personal or vacation time. Whorton said that she wasn't aware of that and she had talked to Lessar. Martinez asked whether Lessar gave permission for her to take the day off. Whorton replied: that Lessar did not say that she could not take the day off; that when she informed Lessar that she would not be at work that day, the only thing that Lessar asked was whether she had personal time so that she would be paid for it; and that when she said that she did not have the time, Lessar said, "okay." [Footnote omitted].

After speaking to Whorton, Martinez met with Lessar and Armstrong. There was a discussion concerning whether the Monday off was supposed to have been for her grandfather's or her friend's funeral, which indicated that even with all the prior discussion, they didn't have their facts straight. They decided that Whorton had not asked for or received permission to take July 18 off and had simply told them that she would not be there. They concluded that it was an unauthorized absence and that she would be terminated.

\* \* \* \* \* \*

Surrounding circumstances such as the timing of the discharge with relation to the date that Respondent obtained knowledge of Whorton's union activity, and the treatment of Whorton after such knowledge was obtained must also be considered.

Respondent learned of Whorton's union activism on the date of the election, May 4, 1977. There is no indication in the record that Whorton engaged in any union activity after that date. About 3 days after May 4, 1977, Lessar [sic] was given a favorable evaluation and a raise. Whorton understood from other employees that the $30 per month raise she received was more than any other employee was given. She did not know the amount of the raise until she received it. The raise was a merit one and could easily have been reduced or done away with if Respondent was hostile toward Whorton because of her known union activity.

On July 4 Lessar authorized Whorton to be absent from work on July 5 because of car repairs. No hostility was shown to Whorton in that regard.

On July 12 or 13, 1977, Lessar spoke to Whorton about promoting her to the security desk and giving her both a promotion and a raise. It is most unlikely that Lessar would have made such remarks if Respondent harbored an animus against

Whorton because of her known union activity.

Whorton was discharged on July 19, 1977. Respondent knew of her union activity on May 4, 1977. Thus, 2½ months elapsed between Respondent's knowledge of her union activity and the discharge. During those 2½ months there were several incidents as described above indicating that Respondent bore no hostility toward Whorton. The Union lost the May 4, 1977 election, objections were filed which were later withdrawn, and the results of the election were certified on June 10, 1977. By July 19, 1977, Respondent had little reason to be concerned about unionization and it would have had little to gain by discharging a union adherent at that late date. While unlawful discharges are sometimes made for pure revenge or for long range effect, the evidence in this case does not support such a conclusion.

The insubstantial nature of Respondent's defense raises doubts in this case. However, the surrounding circumstances are not such as to warrant an inference that Respondent's motive was unlawful. Of particular importance is the lack of proof that Respondent harbored the type of union animus that would make it plausible to believe that Respondent's motive was unlawful. The favorable treatment that Whorton received after Respondent knew of her union activity also indicates a lack of animosity against Whorton. The 2½–month interval between Respondent's knowledge of her union activity and the discharge must also be considered. Viewing the record as a whole, I find that the General Counsel has not established by a preponderance of the credible evidence that there was a causal connection between Whorton's union activity and her discharge, or that Respondent violated Section 8(a)(3) as alleged in the complaint.

[R., Vol. III, at pp. 210–212; 214–215].

Upon review, Board, by a split decision, reversed the decision of the ALJ and held that Bank had violated the Act by interfering with OPEIU's solicitation of employees and by discharging Judy Whorton.

In determining that Bank had violated OPEIU's solicitation of employees, Board held, *inter alia* :

The Administrative Law Judge found that since the General Counsel failed to show that the rights of any employee to receive information from the Union was [sic] infringed by the Respondent's above conduct, and inasmuch as the entire incident arose from Johnston's belief that McGee was leafletting customers, the Respondent did not violate Section 8(a)(1). We disagree. It is well established that an employer cannot legally interfere with a union's solicitation of employees when it takes place on a public street and does not obstruct the ingress or egress from the Employer's premises. It is uncontroverted that McGee was on the public sidewalk and that he did not block the entrance to the bank. McGee testified that he knew that employees used the entrance at lunchtime and that he intended to catch them at the beginning of the lunch period. As noted above, McGee could not distinguish employees from the customers, so he distributed leaflets to anyone who was interested. Consequently, it is clear that McGee was attempting to solicit Respondent's employees, as part of the Union's campaign to organize them, and that Section 7 of the Act protects such activity. Therefore, there is no basis for Respondent's trying to prohibit such activity on a public street and the Respondent, by interfering with McGee's organizing efforts, violated Section 8(a)(1) of the Act. [Footnote omitted]. [R., Vol. III, at pp. 225–226].

In determining that Bank had violated the Act by discharging Judy Whorton, Board held, *inter alia* :

Based upon the foregoing, we infer that Whorton's discharge was motivated by some consideration that the Respondent had purposefully failed to reveal and, contrary to the Administrative Law Judge, that the only motive apparent from this record is union animus. The

inference of union animus is supported by the Respondent's unlawful interference with the Union's solicitation of the Respondent's employees and Lessar's statements to Whorton regarding the Respondent's negative attitude toward her being a union observer. Hence, we conclude that Whorton's discharge was caused by her engaging in protected concerted activity and the reason proffered by the Respondent for the discharge was no more than a transparent rationalization intended to hide the real cause of the discharge. Accordingly, we find that the Respondent's pretextual discharge of Whorton violated Section 8(a)(3) and (1) of the Act.

[R., Vol. III, at pp. 227–228].

Board here seeks enforcement of its determination and related Decision and Order that Bank violated the Act. Thus, the sole issue on appeal herein is whether substantial evidence supports the Board's findings that Bank violated the Act by interfering with the distribution of union election campaign materials and by discharging Judy Whorton. We hold Board's findings are not supported by substantial evidence. Accordingly, we deny enforcement of Board's order.

The standard of proof required under the Act to support a decision of the Board is that the Board's findings must be supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, evidence may properly be considered less substantial when the Board's ALJ, who has personally observed the witnesses and lived with the case, has drawn conclusions at variance with those reached by the Board. In *Cartwright Hardware Company, Inc. v. National Labor Relations Board*, 600 F.2d 268 (10th Cir. 1979), *citing to Universal Camera Corp., supra*, we observed:

The fact findings of the NLRB are conclusive if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f) (1976).

In discussing this review standard, the Supreme Court has instructed: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Evidence may properly be considered less substantial when the NLRB's administrative law judge, "who has observed the witnesses and lived with the case," has drawn conclusions different from those reached by the NLRB. *Id.* at 496, 71 S.Ct. at 469. It is with these principles in mind that we have reviewed the record in this case.

600 F.2d at p. 270.

Thus, when, as here, the issues presented are largely ones of credibility, we will not lightly overturn the decision of the ALJ who had the opportunity to hear the testimony and view the witnesses. In *National Labor Relations Board v. Florida Medical Center, Inc.*, 576 F.2d 666 (5th Cir. 1978), the Court observed:

We view the issue in this portion of the case solely as one of credibility. If Dr. Dauer made the statement alleged by Kelly, there is no question that it was a threat that amounted to a violation of section 8(a)(1) of the Act. Indeed, we cannot imagine a more coercive statement. A court of appeals is generally bound to accept the credibility choices of an administrative law judge as adopted by the National Labor Relations Board. *N.L.R.B. v. Imperial Bedding Co.*, 519 F.2d 1073 (5 Cir. 1975); *N.L.R.B. v. Bogart Sportswear Mfg. Co., Inc.*, 485 F.2d 1203 (5 Cir. 1973); *Bob's Casing Crews, Inc. v. N.L.R.B.*, 458 F.2d 1301 (5 Cir. 1972). Nothing in the record of this case convinces us that the rule should not be applied here. When the issue is simply one of believability, we will not overturn the decision of the ALJ, who had the opportunity to hear the testimony and view the witnesses, unless his findings are self-contradictory. *See Helena Laboratories Corp. v. N.L.R.B.*, 557 F.2d 1183 (5 Cir. 1977).

576 F.2d at p. 671.

### The Solicitation Incident

■ No less a standard should be applied herein to the ALJ's determination that the Board failed to establish that Armstrong and Johnston unlawfully interfered with McGee in his lawful solicitation of employees.

Board's singular assertion that the incident cannot "be said to be so isolated or minor as not to warrant a remedy" is without merit. Board fails to cite substantial evidence or cogent legal authority supportive of this assertion. We decline, under such circumstances, to permit the Board to "bootstrap" the solicitation incident, described by the ALJ as a "petty, momentary squabble", so as to "form an important part of the background against which the Bank's discharge of employee Whorton must be viewed." This simply would not be proper in view of the fact that it is uncontested that: OPEIU initially filed objections to the May 4, 1977 union representation election and thereafter withdrew them, after which the results of the election were certified by the Board; the incident was brief and isolated; there was no showing that the incident precluded OPEIU from distributing leaflets to all employees; there was no showing that any employees were intimidated by the incident; the sole reason for Johnston's and Armstrong's actions in approaching McGee was because McGee was giving leaflets to Bank's customers. These uncontested facts, coupled with the fact that the Board did not attack or rebut the ALJ's specific finding that the holding company that owned Bank did not threaten employees by stating it would not agree to any union contracts and that it would sell Bank if its employees selected a union to represent them, fully support the ALJ's determination that the solicitation incident was not violative of the Act.

### The Whorton Termination

Board's assertion that Whorton's termination was in violation of the Act is equally without merit.

■ We acknowledge, as Board points out, that we have previously held in *National Labor Relations Board v. Montgomery Ward & Co., Inc.*, 554 F.2d 996 (10th Cir. 1977) that the discharge of an employee actively engaged in union affairs gives rise to an inference of violative discrimination. Union activity in that case, however, was extensive and recurring and clearly distinguishable from the facts herein. Whorton's union activity was limited at best; when viewed in the light most favorable to the Board the evidence of Whorton's "union activity" was that she attended several union meetings prior to the election and she acted an an observer at the election. In view of Whorton's very limited "union activity" we decline to infer violative discrimination on the part of Bank.

Since it was uncontested that the Bank terminated Whorton for an unexcused absence, we believe the correct standard for application here was that set forth in *M.S.P. Industries, Inc. v. National Labor Relations Board*, 568 F.2d 166 (10th Cir. 1977), wherein we observed:

> Instead, when the employer has come forward with evidence of a legitimate motive for a dismissal, the effect is then to make it incumbent on the General Counsel to demonstrate explicitly that an improper motive "contributed to the discharge." *Cain's Coffee Co. v. NLRB*, supra, 404 F.2d [1172] at 1175–76 [10th Cir.]. If it is established that an unlawful discrimination against those active in union affairs was a partial motive for a discharge, there is a violation. *NLRB v. Montgomery Ward & Co.*, 554 F.2d 996, 1002 (10th Cir.); *S.A. Healy Co. v. NLRB*, 435 F.2d 314, 316 (10th Cir.); *Betts Baking Co. v. NLRB*, 380 F.2d 199, 203 (10th Cir.).

568 F.2d at pp. 173–174.

■ Accordingly, once, as here, an employer comes forward with a legitimate motive for a dismissal, the burden that a discharge was unlawfully motivated is on the Board. In *Sioux Quality Packers v. National Labor Relations Board*, 581 F.2d 153 (8th Cir. 1978), the Court said:

The burden of proving that a discharge was unlawfully motivated is, of course, upon the Board. *Independent Gravel Co. v. NLRB*, 566 F.2d 1091, 1094 (8th Cir. 1977); *Broadway Motors Ford, Inc. v. NLRB*, 395 F.2d 337, 340 (8th Cir. 1968). A finding of discrimination by the Board must be supported by substantial evidence; it may not rest upon flimsy evidence, mere inference or guesswork. *Independent Gravel Co. v. NLRB, supra*, 566 F.2d at 1094. Finally, "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *NLRB v. Red Top, Inc., supra*, 455 F.2d [721] at 725 [8th Cir.]; *quoting Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951). 581 F.2d at p. 157.

As stated in *Sioux, supra*, the Board's burden of establishing that a discharge was unlawfully motivated must be met by "substantial evidence; it may not rest upon flimsy evidence, mere inference or guesswork". Aside from the Board's attempt to "bootstrap" the solicitation incident of May 3, 1977, as a predicate for Whorton's termination two and one-half months later on July 19, 1977, Board's conclusion that Whorton's termination was unlawfully motivated rests entirely on "flimsy evidence, mere inference or guesswork."

After the isolated solicitation incident is fully considered, Board is unable to set forth with any specificity any evidence supportive of its allegation that Whorton's termination was unlawfully motivated. On the contrary, the evidence adduced in the course of the administrative hearing clearly established that Bank terminated Whorton for an unexcused absence. As a result of the evidence presented during said hearing it was uncontested that: Whorton did not ask for a day off; rather, she simply informed her supervisor that she was taking a day off to attend a funeral; Whorton acknowledged that her supervisor did not say she could take the day off; Whorton acknowledged that she did not have accumulated personal or vacation time to take off for a friend's funeral in accordance with Bank's handbook; Bank's policies prohibited employees from taking leave without their supervisor's permission; Bank's policies called for discharge for unauthorized absences; and Bank's officials "determined that she had not asked for the time off. She had not been given permission. It was an unauthorized absence, so therefore she would be terminated." [R., Official Report of Proceedings at p. 29].

These uncontested facts, coupled with the time frame in which Whorton worked for Bank, considered in conjunction with the pay raise Whorton received both prior to and after the union representation election, clearly establish, in our view, that Whorton was terminated for an unauthorized absence. We hold that her termination was not unlawfully motivated by Bank as alleged by Board.

Bank's actions in this case were not violative of the Act. The Act does not allow Board to act as a "super-employer" in derogation of the right of the employer to select its employees or discharge them. As stated in *Sioux Quality Packers, etc., supra*:

In language often repeated, the Supreme Court has said that "[t]he Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). Nor does the Act give to the Board any supervisory authority to substitute its judgment for that of the employer in making such decisions. *NLRB v. Prescott Industrial Products Co.*, 500 F.2d 6, 11 (8th Cir. 1974); *NLRB v. Red Top, Inc.*, 455 F.2d 721, 726 (8th Cir. 1972). The fact that the Board disagrees with an action by the employer is of no importance. Instead, what the Act purports to do is simply to withdraw a range of factors from the employer's consideration when exercising his otherwise unfettered discretion to discharge an unwanted

employee. In short, sections 8(a)(3) and (1) require that an employer not terminate an employee out of hostility toward the latter's union activities. The question before us, therefore, concerns the motivation, and not the merit, of Means' dismissal.

581 F.2d at pp. 156–157.

We deny enforcement of the Board's order.