45 F.3d 440
 149 L.R.R.M. (BNA) 2128, 129 Lab.Cas. P 11,268
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 SMITH INTERNATIONAL, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 94-9519.
 United States Court of Appeals, Tenth Circuit.
 Jan. 11, 1995.
 
 Before MOORE, BARRETT and HENRY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Smith International, Inc. petitions for review of an order by the National Labor Relations Board (NLRB), adopting findings of the Administrative Law Judge that Smith violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, codified at 29 U.S.C. 158(a). Smith challenges the sufficiency of evidence for the ALJ's findings. The NLRB cross-applies for enforcement of its order, which we grant.
 
 
 2
 Smith International manufactures drill bits for petroleum and mineral extraction. Rodney Ruiz was a machinist at Smith's Ponca City, Oklahoma, plant. During his tenure at Smith, Mr. Ruiz regularly took part in pro-union and other protected activities. Mr. Ruiz handed out union authorization cards for his co-workers' signature, distributed union literature, and discussed wages and unionization with his co-workers. Several managers at Smith were well aware of Mr. Ruiz' pro-union activities.
 
 
 3
 Prior to being terminated, Mr. Ruiz filed a complaint against Smith with the state labor board. Several Smith managers were aware of this action. In addition, Mr. Ruiz assisted Melvin Osborne, a co-worker, in drafting a complaint to the NLRB. Mr. Osborne's supervisor, John Stout, upon seeing a copy of the draft, told Mr. Osborne Mr. Ruiz was "history."
 
 
 4
 In early 1991, Smith granted its employees an "equity adjustment"--a raise designed to standardize the disparate wages earned by employees hired in different years. Mr. Ruiz received a 42 cent per hour increase. The notice advising him of the equity adjustment listed his pre-adjustment wage at $9.32 per hour. However, Mr. Ruiz' wage at the time was $9.42. Mr. Ruiz notified his supervisor of the error. Mr. Ruiz suspected that the amount of his adjustment, and possibly the error in pre-adjustment wage, were in retaliation for his pro-union activities.
 
 
 5
 In an effort to investigate the error, Mr. Ruiz conducted an informal wage survey of ten co-workers, asking them what classification they held and what their wages and equity adjustments were. Shortly thereafter, Mr. Ruiz contemplated filing charges with the NLRB. In July, Mr. Ruiz spoke with Wes Hill, the leg department supervisor, about his equity increase and the discrimination he felt was being exercised against him due to his pro-union activities. Mr. Hill told Mr. Ruiz that some of Smith's managers held Mr. Ruiz' union activities against him, and that Mr. Ruiz had been a topic of conversation in supervisors' meetings. Mr. Ruiz asked Mr. Hill whether this might affect his next performance review. Mr. Hill promised Mr. Ruiz his union activities and the wage survey would not be held against him.
 
 
 6
 In September, Mr. Ruiz received his performance review. It included a low rating--one out of five--in the category entitled "Handling Information With Discretion (pay, rumors, personal information, etc.)." Upon receiving his review, Mr. Ruiz again spoke to Mr. Hill. Mr. Hill circled the word "pay" on the review form and told Mr. Ruiz the poor rating was because Mr. Ruiz conducted a wage survey and discussed his wages with other employees. Mr. Ruiz reminded Mr. Hill of the promise not to hold the wage survey against him; Mr. Hill replied, "I guess I did anyway." Mr. Ruiz then brought to Mr. Hill's attention the section rating Mr. Ruiz' "Attitude Toward Company and Department." Mr. Ruiz speculated that he had received a poor rating--two out of five--because he filed charges with the NLRB. Mr. Hill answered, "That's right. You think the company is out to get you and ... that's a bad attitude."
 
 
 7
 Mr. Ruiz then contacted Personnel Director William Werling. When Mr. Ruiz complained about his rating, Mr. Werling suggested Mr. Ruiz might be happier if he found another job. He further advised Mr. Ruiz to redirect his energies in a more positive direction.
 
 
 8
 Mr. Ruiz finally contacted Plant Manager Pat Mulligan. When Mr. Ruiz asserted that Mr. Werling improperly held pro-union activities against him, Mr. Mulligan said, "and rightfully so ... I'm not very happy about it either."
 
 
 9
 Smith's production schedule is based on its inventory needs, which are planned from market statistics, including the "domestic rig count," or number of drilling rigs in current operation in the United States. Demand for drill bits is cyclical, but Smith uses the cushion of inventory stockpiles to smooth out its production schedule and thereby stabilize the number of employees involved in production. However, in 1991, Smith had a large excess of inventory on hand, and decided to lay off employees. It reduced its worldwide staff from 3,500 to 2,700. Of these, 144 employees were laid off from the Ponca City plant. The Ponca City layoffs occurred in four rounds. On November 15, 1991, Smith laid off 50 employees. On December 7, 1991, it laid off 50 more employees. On February 7, 1992, it laid off 38 employees, including Mr. Ruiz. The final layoff, in March 1992, involved 6 employees.
 
 
 10
 Smith's policy is to lay off employees based on seniority within classification within department. Smith classifies its production employees according to the type and number of machines they can operate. When Smith lays off employees, those with greater seniority may avoid layoff by "bumping" into a lower classification. The new job must be in the employee's current department, and the employee must have previously held the lower classification.
 
 
 11
 Mr. Ruiz' first permanent classification at Smith was "Leg Machine Operator." From this, he was promoted to "CNC Machining Center Operator" and "CNC Machinist." His last promotion took place in September 1991. On December 11, 1991, he "bumped" back into the Leg Machine Operator classification to avoid layoff.
 
 
 12
 On February 6, there were two leg machine operators working in Department 17--Mr. Ruiz and Eric Page. Mr. Ruiz was senior to Mr. Page. On February 7, both were laid off. Mark Martin, a CNC Machinist also in department 17, was allowed to "bump" into the leg machine operator position. Mr. Martin had never held the Leg Machine Operator classification. In fact, Mr. Martin had been trained by Mr. Ruiz on the leg machine. Other employees were allowed to bump or transfer into other departments to avoid layoff, but Mr. Ruiz was not allowed to do so.
 
 
 13
 Smith had a "recall" policy entitling laid-off employees to be rehired in order of seniority within job classification. Recall occurs only if Smith requires additional workers on or before the "recall date," which is 90 days after layoff. Although Smith rehired employees laid off from its Ponca City plant, even after their recall date, it made no such offer to Mr. Ruiz--either on a permanent or temporary basis. Many of the recalled employees had less plant seniority than Mr. Ruiz, and some of them filled classifications previously held by Mr. Ruiz.
 
 
 14
 Smith's appeal challenges the sufficiency of evidence for the ALJ's findings. Such findings must be affirmed if they are supported by "substantial evidence" on the record. 29 U.S.C. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).
 
 
 15
 The adjudication of labor act violations involves shifting burdens of proof. First, the NLRB must establish a prima facie case that the employee's conduct "was a substantial or motivating factor in the employer's decision" to discharge the employee. Mississippi Transport v. NLRB, 33 F.3d 972, 979 (8th Cir.1994). Proof of the employer's motive may be circumstantial. NLRB v. Link Belt Co., 311 U.S. 584, 597-98 (1941). It may consist of no more than the termination of an employee whose involvement in pro-union activities is known to management. Intermountain Rural Electric Ass'n v. NLRB, 732 F.2d 754, 763 (10th Cir.), cert. denied, 469 U.S. 932 (1984). The employer may refute the prima facie case by showing by a preponderance of evidence that it would have taken the same action in the absence of the pro-union activities. Id.
 
 
 16
 It is an unfair labor practice to "interfere with, restrain or coerce employees" in the exercise of protected acts. 29 U.S.C. 158(a)(1). Protected activity includes the discussion of wages by an employee who believes he has been underpaid. NLRB v. American Spring Bed Mfg. Co., 670 F.2d 1236 (1st Cir.1982). It also includes polling other employees regarding employment benefits. Edward Blankstein, Inc. v. NLRB, 623 F.2d 320 (3d Cir. 1980). Coercion can consist of a mere verbal reprimand. Coors Container Co. v. NLRB, 628 F.2d 1283, 1287 (10th Cir.1980). It can also consist of a threat to terminate employment, no matter how idle. NLRB v. Radio King Corp., 416 F.2d 569, 572-73 (10th Cir.1969), cert. denied, 397 U.S. 1007 (1970). The coercive acts need not actually discourage unionization; they are prohibited where the natural and probable consequences of the action of the employer are to discourage protected activities. Western Contracting Corp. v. NLRB, 322 F.2d 893, 901 (10th Cir.1963).
 
 
 17
 The ALJ found Smith in violation of section 8(a)(1) because Smith penalized Mr. Ruiz for discussing his wages with other employees, encouraged him to quit because of his protected activities, and told him it held his activities against him. In addition, Smith retaliated against Mr. Ruiz by giving him a low performance evaluation. Smith does not dispute that such evidence composes a prima facie case. Neither does it dispute that such actions, when motivated by anti-union animus, are violations of the Act. Smith argues it presented enough evidence to refute the case.
 
 
 18
 Smith argues Mr. Ruiz' performance ratings did not affect the overall rating of Mr. Ruiz as an average employee. Mr. Ruiz received 3 out of 10 points in the sections of his review rating "Discretion" and "Attitude." Smith does not dispute the connection between these ratings and Mr. Ruiz' protected activities. Mr. Ruiz' overall rating on the review was 32 out of 55. A chart promulgated by Smith shows the "Pay Increase Guidelines" to be zero to ten cents for employees in the Average range, 27-39 points, and eleven to thirty cents for the Above Average Range, over 40 points. If Mr. Ruiz had received the highest possible ratings on the two affected categories--Attitude and Discretion--he would have gained 7 points, for a total of 39. Smith concludes Mr. Ruiz' score of 32 made no difference because Mr. Ruiz would have received the same pay raise even without the poor ratings.
 
 
 19
 However, to escape liability on this violation, Smith would have to prove that each score on the performance review would have been the same in the absence of protected activities. The natural and probable consequence of low performance ratings based on protected activities is to deter an employee from engaging in those activities, regardless of whether wages are affected.
 
 
 20
 In addition, Smith's performance review forms identify performance rating as the primary criterion for wage increases and promotion. Even if Mr. Ruiz' ratings did not affect his immediate employment terms, they may have affected his long-term success at the company--had he remained employed.
 
 
 21
 An employer is prohibited from discouraging "membership in any labor organization" by "discrimination or in regard to hire or tenure of employment or any term or condition of employment...." 29 U.S.C. 158(a)(3). The ALJ found Smith in violation of section 8(a)(3) because Smith laid off Mr. Ruiz and refused to recall him, both due to anti-union animus. Again, Smith does not dispute that such actions compose a prima facie case for violation of the Act.
 
 
 22
 Smith first argues it presented uncontested evidence that the layoffs were motivated by economic necessity. Even so, the ALJ found Smith violated its own layoff, bumping, and recall policies with respect to Mr. Ruiz. Without an explanation of such differential treatment, Smith cannot prevail.
 
 
 23
 Smith presented evidence that Mark Martin had previously held a classification equivalent to "Leg Machine Operator." However, this does not refute the ALJ's conclusion that Smith did not uniformly apply its layoff and bumping policies. Moreover, the testimony on the point was conflicting, and therefore does not survive the standard of review. The ALJ could reasonably conclude that Smith bent the rules in Mark Martin's favor and to Mr. Ruiz' detriment.
 
 
 24
 Smith's next argument hinges upon the time lag between the layoff and the events indicating anti-union animus. Mr. Ruiz' unfavorable review is dated March 26, 1991. Mr. Ruiz was terminated on February 7, 1992. Smith concludes the intervening eleven months negate any animus that may have existed. This conclusion is erroneous both at law and in fact. At law, later conduct cannot vitiate a threat to protected activity. NLRB v. Albion Corp., 593 F.2d 936, 939 (10th Cir.1979). It follows that inaction cannot do so, either. Smith relies on NLRB v. First Nat'l Bank of Pueblo, 623 F.2d 686, 693 (10th Cir.1980), for the proposition that remoteness in time precludes a connection between anti-union animus and termination. This case stands for no such rule. We declined to enforce the Board's order because its conclusions were based on "flimsy evidence, mere inference or guesswork." Id. (quoting Sioux City Packers v. NLRB, 581 F.2d 153 (8th Cir.1978)). Time lapse was only one piece of evidence supporting that determination.
 
 
 25
 In fact, the record reveals Smith's institutional memory to be well in excess of eleven months. When Mr. Ruiz discussed his poor review with William Werling, Mr. Werling attributed part of the low rating on discretion to an incident that had taken place two years earlier. Mr. Ruiz had made an insurance claim that engendered some ill will between Mr. Ruiz and Karen Banta, who administered such claims for the company. Mr. Werling stated Mr. Ruiz had handled the matter poorly. Mr. Ruiz asked, "[W]hat does an incident that happened two years ago have ... to do with an appraisal for the last six months?" Mr. Werling did not answer, except to complain about Mr. Ruiz' involvement in a local mayoral race. Finally, when Mr. Ruiz was advised of his layoff, the hallway leading out of his place of work was lined with a gauntlet of Smith management. They were on hand because "they expected trouble" from Mr. Ruiz. The ALJ could easily infer Smith's anti-union animus to be alive and well despite the time elapsed.[2]
 
 
 26
 Smith managers testified that the employees who were recalled were hired beyond their recall date, and even then, hired only on a temporary or "contract" basis. Smith concludes Mr. Ruiz had no right to recall, and the ALJ's finding Smith in violation of section 8(a)(3) with respect to recall is error.
 
 
 27
 The issue is not whether Mr. Ruiz had a right to recall, but whether Smith discriminated against him in regard to his tenure of employment. The status of the recalled employees, temporary or permanent, and the right to recall are irrelevant to the issue of discrimination. The ALJ concluded Smith violated its stated policy by recalling employees with less seniority than Mr. Ruiz. This conclusion is supported by substantial evidence on the record and is not error.
 
 
 28
 The record presents substantial evidence to support violation of sections 8(a)(1) and 8(a)(3). The NLRB's order is enforced.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 At oral argument, Smith reasoned if it had been motivated to terminate Mr. Ruiz due to anti-union animus, it would have done so on the first round of layoffs, not the third. The NLRB responded that the first round of layoffs involved no one in Mr. Ruiz' department and classification; his job was not at risk. If so, given Smith's professed policy of laying off by classification within department, Mr. Ruiz could not have been laid off during the first round. The record does not contain a breakdown of the department and classification of employees laid off in December. We note that Smith, in making this argument to refute the prima facie case, had the burden of providing such evidence
 In the second round of layoffs, Mr. Ruiz would have been terminated but for his decision to accept the lower classification of Leg Machine Operator. On the third round, he was terminated. These facts are not inconsistent with the ALJ's finding that the termination was motivated by anti-union animus.