**KENRICH PETROCHEMICALS, INC.,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent/Cross–Petitioner.

Nos. 89–3392, 89–3500.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1989.

Decided Jan. 29, 1990.

Order Granting Rehearing In Banc in Part, Opinion Vacated in Part March 20, 1990.

Bruce P. McMoran (argued), William A. Behan, John L. Thurman, McMoran & Palmieri, P.C., Lebanon, N.J., for petitioner/cross-respondent.

Joseph E. Desio, Acting Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein, Supervisory Atty., David A. Seid (Argued), Atty., N.L.R.B., Washington, D.C., for respondent/cross-petitioner.

Before STAPLETON, GREENBERG, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

### BACKGROUND

Petitioner Kenrich Petrochemicals, Inc. seeks review of a final order entered on May 31, 1989, in which the National Labor Relations Board held that Kenrich committed a host of unfair labor practices in response to its clerical workers' decision to unionize. Specifically, Kenrich challenges the Board's decision that its discharge of supervisor Helen Chizmar violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), because it was in retaliation against her relatives for participating in the union campaign. Kenrich asserts as well that the Board erred when it found that it violated sections 8(a)(1) and (3) of the Act when its president physically assaulted employee Barbara Knorowski, causing Knorowski and a co-worker, Catherine Chizmar, to be absent from work, and when Kenrich refused to reinstate Knorowski following a four month disability leave.

Finally, Kenrich contends that the Board erred in its finding that the discharge of union steward, Karen McPartlan, violated sections 8(a)(1) and (3) because she was discharged for her refusal to comply with an unlawful change in her work hours. The Board has cross-petitioned for enforcement of its order. The Board did not write a separate opinion. Rather it adopted an order of an administrative law judge whose decision and order were dated December 30, 1988.

We agree with the Board that Helen Chizmar's discharge violated section 8(a)(1) of the Act but deny enforcement of its order that Chizmar be reinstated with backpay, as we fail to see how the order serves any legitimate remedial purpose. We have decided to reserve judgment on the lawfulness of Karen McPartlan's discharge but will remand the matter to the Board for further consideration of Kenrich's liability and the enforceability of the Board's selected remedy. In all other respects, under the appropriate standard of review, we find no basis to disturb the order of the Board. Thus, to the foregoing extent regarding Helen Chizmar the petition for review will be granted but, with the exception of our remand regarding Karen McPartlan, it will otherwise be denied.

### FACTS

Kenrich Petrochemicals, Inc. is a Delaware corporation headquartered in Bayonne, New Jersey, engaged in the sale and manufacture of various chemical products. Kenrich's President is Salvatore Monte, its Vice–President is his wife, Erica Monte, and its Vice–President of Operations is Charles Lucania. For approximately 20 years prior to the events in question, Kenrich's production workers have been represented by Local 8–406, Oil, Chemical and Atomic Workers International Union AFL–CIO. This petition for review concerns the organizational activities of Kenrich's clerical staff.

As of May, 1987, Kenrich's clerical staff consisted of seven employees: Barbara Knorowski, Catherine Chizmar, Karen

McPartlan, Michelle Bobb, Marge McNally, Judy Kobryn and Linda Ferrano. These individuals were directly supervised by office manager Helen Chizmar. Helen Chizmar is Knorowski's sister, McPartlan's mother, and Catherine Chizmar's mother-in-law.

In May, 1987, all of the clerical employees signed authorization cards at Local 8–406's office designating the union as their bargaining representative. On May 21, 1987, the employees notified Helen Chizmar of their decision to unionize and, the following day, Kenrich received a letter from the union requesting recognition. On May 26, 1987, the union filed a petition with the Board seeking certification as the employees' representative.

Monte testified that he "felt ... betrayed" when he received the union's letter requesting recognition. He assessed Kenrich's chances for defeating the union's organizational drive and concluded that Barbara Knorowski and Karen McPartlan would prove to be firm union supporters because unionization was "in the family culture." App. at 394.[1] He was unconcerned about Linda Ferrano's and Judy Kobryn's sentiments toward the union because he had already determined to make Linda Ferrano his confidential secretary, thus rendering her ineligible for the union, and Judy Kobryn was leaving Kenrich. Accordingly, Monte decided that McNally, Bobb, and Catherine Chizmar would be the swing votes in any Board election.

On June 3, 1987, Salvatore and Erica Monte and Kenrich's founder, Eric Spielgelhalder, met with McNally, Bobb and Catherine Chizmar to attempt to dissuade them from supporting the union. The three employees were not receptive to Kenrich's arguments. About a week later, Monte, in a private conversation with Catherine Chizmar, reiterated Kenrich's position and again was rebuffed. After that conversation, Monte became convinced that unionization of the clerical staff was inevitable and therefore, on June 16, 1987, he authorized Kenrich's offer of voluntary recognition of the bargaining unit pending a card count. The union rejected this offer, insisting instead on a Board election. The union prevailed in an election held on July 2, 1987 and was certified on July 10, 1987.

### 1. Helen Chizmar's Discharge

As noted above, the clerical employees informed their supervisor, Helen Chizmar, of their decision to unionize on May 21, 1987, the day before Kenrich received the union's request for recognition. Helen Chizmar testified that she was "shocked" when she learned of the organizational drive but that she did not inform other managers of the drive because she felt that it would be futile to raise the issue, given that Kenrich would receive the union's letter the following day. Also, she feared that Monte would suspect that she was involved in the employees' union activities if she spoke to him about the matter.

After Kenrich received the union's letter, Lucania called Helen Chizmar and several other managers to his office to discuss Kenrich's prospects for defeating the union campaign. During the meeting, Lucania showed Chizmar the letter and stated, "[h]ere, read the letter, but you probably know all about it already." To this, Chizmar said nothing. Lucania informed the managers that Kenrich was somewhat pessimistic about its prospects for defeating the union, because the employees' decision was unanimous.

Helen Chizmar testified that she became apprehensive about her job security after she learned that her three relatives, Knorowski, McPartlan and Catherine Chizmar, had signed authorization cards. On May 29, 1987, her fears materialized for at the end of the day, Monte discharged her without warning. That same day, Kenrich had received notice of the petition the union had filed with the Board seeking recognition on the basis of the card count.

Monte's purported reasons for Helen Chizmar's discharge were somewhat incon-

1. The production workers' former shop steward, Frank Sakowski, is Knorowski's father and McPartlan's grandfather.

sistent. At the time of the discharge, he told her that Kenrich could no longer afford to pay her salary: "[w]e have to let you go, Helen. We just can't afford you anymore. You're making, we think we can get somebody for $20,000 less and that's what we plan to do." Later that same day, Monte told Kenrich's buyer and admitted agent, Jill Bernicker, that he had discharged Chizmar because "[he] couldn't keep her for financial reasons and [he] was not going to put up with any union bullshit." In early June, he told Catherine Chizmar that "[he] had to fire Helen because she couldn't do the technical end of her job." [2] In a subsequent conversation, he told Catherine that he had fired Helen "because [he] couldn't afford her and no matter what [he] did for her, she was never happy."

At the hearing, Monte insisted that he terminated Helen Chizmar because it would be impossible for her to manage a bargaining unit which included three of her close relatives without compromising her loyalty to Kenrich:

> [h]ere was going to be my office manager managing an office full of relatives, and there was no way she could properly represent me. It created a tremendous conflict of interest in my mind. How was this woman going to manage her own relatives? ... I saw no way but to get rid of her.

App. at 409–10. Monte indicated that his concern about Helen Chizmar's conflict of loyalties was heightened by the fact that she had previously shown favoritism toward her relatives. In addition, he believed that Chizmar had advance notice of union organizing activity and had acted disloyally in failing to disclose that information to him.

### 2. The June 18 Incident and Knorowski's Layoff

Salvatore Monte's father died in Florida on June 14, 1987. Before leaving for the funeral, he instructed counsel to inform the union that Kenrich would voluntarily recognize it on the basis of a card count. While in Florida, he repeatedly contacted his office and became infuriated when he learned that Barbara Knorowski, along with other employees, had been attempting to persuade Linda Ferrano to support the union.

Upon Monte's return to the office on June 18, 1987, Knorowski approached him in a narrow corridor and, clasping his hand, attempted to express her condolences for his father's death. Monte pushed Knorowski's hands away, stated that he did not "want [her] fucking condolences," and continued walking down the hallway, knocking her against a filing cabinet. Knorowski immediately became hysterical and began crying, "he hit me, he hit me."

Still hysterical, she returned to her desk and informed Catherine Chizmar about the incident. Unable to calm Knorowski, Catherine Chizmar telephoned the production workers' shop steward, Bob McClean, for assistance. Monte then entered the office and, observing that Knorowski was still crying, asked, "[w]hat the hell's wrong with you[?]" Chizmar questioned Monte why he had pushed Knorowski and he replied that "it [was] none of [her] fucking business." Chizmar called Monte a "bastard" and a "hypocrite" and he countered that if she did not like the way he ran his business, she could "get the fuck out." He proceeded to push a bin of papers off Chizmar's desk and call Knorowski a "fucking cunt."

Around that time, Bob McClean arrived and asked Monte what had happened. Monte responded, "You know what happened. It's got to do with this f'ing union." After McClean left, Al Ferrante, the union's President, telephoned Knorowski and, upon overhearing Monte utter additional profanities, recommended that Knorowski and the other clerical employees leave the office. Both Catherine Chizmar and Knorowski informed Monte that they

---

**2.** At the hearing, Monte testified that Helen Chizmar's discharge was unrelated to her job performance. App. at 469.

were sick and went home.[3] Before their departure, Monte made a second reference to the union, stating "[y]ou guys have no idea what the hell you're getting in with the fucking union."

The following day, Catherine Chizmar was examined by her personal physician, who provided her with a note which stated that she would be unable to resume work until June 25, 1987 "due to an acute exacerbation of her hypertension and an anxiety related situation." On June 19 and June 23, Knorowski's husband called Lucania to inform him that Knorowski was ill and under a doctor's care, and that he did not know when she could return to work. On or about June 22, 1987, Kenrich received a note from Knorowski's physician which stated that she would be unable to work until further notice.

On June 23, Kenrich sent mailgrams to Catherine Chizmar and Knorowski in which it accused them of faking their illnesses and advised them that they would not receive any pay for their sick days unless they submitted to an examination by Dr. Williams, a physician selected by Kenrich. On June 25, Dr. Williams examined the employees and issued 'disability certificates' for them. Knorowski's certificate stated that she was "partially incapacitated from 6/18/87 to indefinite" due to an "acute anxiety neurosis" and that she had been referred to a psychiatrist, Dr. Jacoby. Chizmar's certificate stated that she had been incapacitated from June 18 to June 25, and that her hypertension had been controlled. Following its receipt of Dr. Williams' certificates, Kenrich paid the employees for their sick days, and Catherine Chizmar returned to work without incident on June 25.

Kenrich was dissatisfied with Knorowski's original doctor's note because it did not state the nature of her illness or her anticipated date of return. Dr. Williams

informed Lucania that Knorowski was "in very bad shape" and required psychiatric care. By letter dated July 1, 1987, Knorowski's personal physician, Dr. Black, informed the company that Knorowski was suffering from an "acute anxiety disorder" and that her "[p]rogress [was] guarded." The letter did not, however, specify her return date.

On July 4, Kenrich placed a newspaper advertisement for a sales order clerk and hired Barbara Mateland on July 27 to replace Knorowski. Kenrich also hired about four other clerical employees during June and July. Neither Monte nor Lucania contacted Knorowski before hiring Mateland to ascertain whether she intended to return to work. Monte testified that he "didn't think she wanted to be in the same office with [him] anymore" because of the incident on June 18. By the same token, Knorowski never directly contacted Kenrich to inform it of her expected return date.

Kenrich apparently learned that Knorowski intended to resume work on November 1, 1987, when, on September 3, Lucania received certain insurance forms from Kenrich's insurance carrier which Knorowski and her psychiatrist, Dr. Jacoby, had filled out in connection with a long term disability claim she had filed.[4] The forms specified the nature of Knorowski's illness as an "adjustment disorder" caused by an "emotional injury" which occurred on June 18, 1987. Kenrich's physician, Dr. Williams, completed an additional insurance form on October 5, 1987, in which he indicated that Knorowski had an "overriding fear of returning to work" but that she should be capable of trial employment on November 1, 1987.

Knorowski appeared for work on November 2, 1987. Immediately after her arrival, she was summoned to a meeting with Salvatore Monte and Lucania, who informed her that she was being placed on indefinite

---

**3.** Two other clerical employees, Marge McNally and Michelle Bobb, called in sick in the afternoon. App. at 523. Karen McPartlan was on vacation at the time.

**4.** Lucania sent Knorowski the appropriate insurance forms on August 20, 1987. In his cover

letter accompanying the forms, he made no reference to the length of Knorowski's disability or Kenrich's lack of certainty regarding her continued employment or her return date. App. at 596.

layoff because Kenrich had already hired a replacement for her and no other clerical positions were available. When Knorowski objected that she had seniority over her replacement, Lucania responded that she "didn't give [Kenrich] any information that [she] would be coming back to work." Monte further advised her that she would be recalled if there were any clerical openings in the future. Knorowski's layoff status continued until July 7, 1988, when Kenrich recalled her and reinstated her to her former position.

### 3. *McPartlan's Discharge*

Prior to June 1987, Kenrich allowed its clerical employees to work part-time. Karen McPartlan began work with Kenrich in 1975 on a flex-time basis but left in 1980 to have children. In the summer of 1983, she resumed work on an "as needed basis" at Monte's request. This situation continued until May 1984 when she became a part-time employee with flexible hours and began receiving Kenrich benefits. In September 1986, Kenrich moved to eliminate part-time employment among the clerical staff. However, Kenrich did not require McPartlan to comply with its new policy at that time but, instead, eliminated her flex-time schedule, setting her hours at 9:00 a.m. to 3:00 p.m. This arrangement lasted until June 1, 1987, when Monte informed the clerical staff that all clerical employees were expected to work a full time schedule, from 8:30 a.m. to 5:00 p.m.[5] McPartlan did not mention her change in hours to Monte because she was able to adhere to her new schedule during the summer, while her children were attending summer camp.

On August 3, 1987, following its certification by the Board, the union notified Kenrich that McPartlan had been selected as its shop steward and would be a member of the union's negotiating committee. Several weeks later, McPartlan requested reinstatement of her part-time hours because her children were resuming school and she could no longer adhere to a full-time schedule. Monte told her that "with all this union stuff ... going on ... [he could not] make any kind of agreement with [her] outside of the collective bargaining agreement."

By letter dated September 11, McPartlan informed Kenrich that she intended to "resume [her] school year hours of 9:00 a.m. to 3:00 p.m. effective September 14, 1987." Kenrich immediately notified McPartlan in writing that she was expected to work a full-time schedule. On September 15 and 16, McPartlan arrived for work at 9:00 a.m. and each day received warning letters in which Kenrich threatened disciplinary action, including discharge, if she continued to adhere to a part-time schedule. Kenrich discharged McPartlan on September 17 when she again followed her part-time schedule. McPartlan's termination letter stated that she had been discharged for her "flagrant disregard of company rules."

## DISCUSSION

### *Discharge of Supervisor Helen Chizmar*

Kenrich maintains that the ALJ erred in finding that Kenrich's discharge of Helen Chizmar violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), because the judge improperly applied an outmoded subjective test when analyzing the claim. Kenrich does not dispute that a supervisor's discharge may serve as the predicate for an 8(a)(1) violation where the discharge "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" their right to engage in protected concerted activity. Indeed, Kenrich could not plausibly so argue, as it is settled law that, notwithstanding the statutory exclusion of supervisors from the Act's protection, *see* 29 U.S.C. § 152(3) & (11), that an employer's discharge of a supervisor may give rise to an 8(a)(1) violation. *See, e.g., Delling v. NLRB*, 869 F.2d 1397 (10th Cir.1989) (discharge of supervisor for refusal to falsify termination slips of unlawfully discharged employees);

---

**5.** The Board decided that Kenrich's elimination of part-time employment among the clerical staff constituted an independent violation of sections 8(a)(1) and (3) of the Act. As Kenrich does not seek review of this finding, we assume it to be correct for purposes of our analysis of McPartlan's discharge.

*NLRB v. Advertisers Mfg. Co.*, 823 F.2d 1086 (7th Cir.1987) (discharge of supervisor in retaliation for her son's union activities); *Oakes Machine Corp., A Subsidiary of Kathy Industries, Inc.*, 288 NLRB No. 52 (1988) (discharge of supervisor because of his stated intention to testify on employee's behalf). *See also Florida Power and Light Co. v. Int'l Brotherhood of Electrical Workers*, 417 U.S. 790, 808 n. 18, 94 S.Ct. 2737, 2746 n. 18, 41 L.Ed.2d 477 (1974). Instead, Kenrich argues that the only relevant inquiry in a case involving a supervisor's discharge is whether the circumstances underlying the discharge were objectively reasonable, regardless of the employer's motivation or the effect of the discharge on the employees' protected activity.

Kenrich relies on *Parker–Robb Chevrolet, Inc.*, 262 NLRB 402 (1982), *enforced sub nom., Automobile Salesmen's Union v. NLRB*, 229 U.S.App.D.C. 105, 711 F.2d 383 (1983), wherein the Board overruled its longstanding and widely criticized precedent that a discharge of a supervisor violates section 8(a)(1) if it is an "integral part" of a plan or is part of a "pattern of conduct" intended to intimidate employees in the exercise of their Section 7 rights. *Id.* (citing *DRW Corporation d/b/a/ Brothers Three Cabinets*, 248 NLRB 828 (1980)).[6] In overruling the "pattern of conduct" cases, the Board reasoned that they unduly extended the Act's protection to situations where the supervisor's discharge had only an incidental effect on employees' section 7 rights. 262 NLRB at 403. Thus, rather than vindicating employees' rights, the cases had the primary effect of imposing liability on employers for discharges of supervisory personnel which were clearly lawful under the Taft–Hartley amendments. *Id.* The Board also stated, in language especially pertinent to this appeal, that the subjective standard it had applied

when assessing the legality of the supervisor's discharge was "clearly unworkable" because the "employer's subjective hope or expectation" that the discharge might discourage union activity could not "change the character of its otherwise lawful conduct." *Id.* at 404 & n. 15.

Kenrich focuses on the above language in arguing that, since *Parker–Robb*, supervisor discharges have been governed by an objective standard. Applying this standard, Kenrich maintains that its discharge of Chizmar was lawful because no reasonable employer would tolerate a situation where a supervisor directly managed a bargaining unit composed of her close relatives. Indeed, as Kenrich points out, the ALJ himself acknowledged that, viewed objectively, the organizational activities of Chizmar's relatives did create an irreconcilable conflict of interest which necessitated Chizmar's discharge. According to Kenrich, this observation should have ended the ALJ's analysis: once Kenrich identified a legitimate objective basis for the discharge, the ALJ's further inquiry into its actual motivation in discharging Chizmar was barred by *Parker–Robb*.

Insofar as Kenrich's defense raises a question of law, our review is plenary, although the Board's legal analysis is "entitled to respect if based upon a reasonably defensible construction of the Act." *NLRB v. Local 54, Hotel Employees & Restaurant Employees Int'l Union, AFL–CIO*, 887 F.2d 28, 29 (3d Cir.1989); *NLRB v. Louton, Inc.*, 822 F.2d 412, 414 (3d Cir. 1987). *See also NLRB v. United Food & Commercial Workers' Union Local 23, AFL–CIO*, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (where the statute is " 'silent or ambiguous,' " the Board's statutory interpretation should be sustained if it is "rational and consistent.") (citation omitted).

---

**6.** In its "pattern of conduct" cases, the Board had found that a discharge of a supervisor who engaged in or otherwise assisted union activities could serve as a predicate for an independent 8(a)(1) violation if the discharge was contemporaneous with an unlawful discharge of a rank and file employee. The existence of a violation turned on the employer's motivation in dis-

charging the supervisor: "there [was] no violation if the supervisory discharge [was] motivated by disloyalty, but a supervisor's discharge [was] found to be unlawful if it [was] motivated by a desire to thwart organizational activity among employees." *Parker–Robb*, 262 NLRB at 404.

The issues, as framed by Kenrich, bring into sharp relief a difficult and recurring problem in the federal labor law, namely the extent to which the Board, in seeking to vindicate the statutory rights of rank and file employees, may limit an employer's otherwise unfettered right to discharge a supervisor. On the one hand, the Labor Management Relations Act of 1947, (Taft–Hartley), 29 U.S.C. § 141 *et seq.*, excluded supervisors from the statutory definition of protected employees in order to preserve the employer's right to the undivided loyalties of its supervisory personnel. In *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 661–62, 94 S.Ct. 2023, 2028, 40 L.Ed.2d 443 (1974), the Supreme Court stated that the history of the Taft–Hartley amendments:

> compels the conclusion that Congress' dominant purpose in amending §§ 2(3) and 2(11), and enacting § 14(a) was to redress a perceived imbalance in labor-management relationships that was found to arise from putting supervisors in the position of serving two masters with opposed interests.

An employer may relinquish its right to demand undivided loyalty from supervisors by employing unionized supervisors. *Florida Power and Light*, 417 U.S. at 812–13, 94 S.Ct. at 2748–49. However, the employer does not commit an unfair labor practice if it discharges or otherwise discriminates against supervisors because of their concerted activities. *Id.* *See also Hi–Craft Clothing Co. v. NLRB*, 660 F.2d 910, 918 (3d Cir.1981).

On the other hand, the Board has long recognized, with court approval, that the Taft–Hartley amendments do not license an employer to compel a supervisor, on pain of discharge, to serve as a conduit for unfair labor practices or take other action which "directly interferes" with employees' statutory rights. *Automobile Salesmen's Union, Local 1095 v. NLRB*, 711 F.2d at 386–87. In seeking to preserve employees' Sec-

tion 7 rights, the Board has attempted to "draw the proper line between protecting the employer's right to demand loyalty from his supervisors and protecting the employee's right to be free from unfair labor practices funnelled through a supervisor by the employer." *Id.* at 386. *See generally* Comment, *Union Busters and Front-Line Supervisors: Restricting and Regulating the Use of Supervisory Employees by Management Consultants during Union Representation Election Campaign*, 135 U.Pa.L.Rev. 453, 470–74 (1987).

 As the Board's experience in the "pattern of conduct" cases demonstrates, that line is not easily drawn. However, we are not persuaded by Kenrich's argument that the Board categorically rejected its subjective test when it overruled those cases in *Parker–Robb*. According to our understanding of the Board's approach to supervisor discharges, the objective standard set forth in *Parker–Robb* is confined to cases where the supervisor's discharge incidentally affects employees' exercises of Section 7 rights.[7] In *Parker–Robb*, the Board identified three classes of cases where such discharges directly interfere with protected concerted activity: where the supervisor is terminated for testifying on behalf of a protected employee, for refusing to commit an unfair labor practice, or for failing to prevent unionization. As explained below, we believe that the Board continues to apply a subjective standard in cases falling within recognized exceptions to the *Parker–Robb* rule.

Our result in this case is informed by *Advertisers Manufacturing Co.*, 280 NLRB 1185 (1986), *enforced*, 823 F.2d 1086 (7th Cir.1987), wherein the Board grafted an additional exception to the *Parker–Robb* rule for cases in which a supervisor is discharged in retaliation against the protected concerted activities of her close relatives. *Id.* at 1186 (reaffirming *Consolidated Foods Corp.*, 165 NLRB 953 (1967) and

---

**7.** The Board's language in *Parker–Robb* might also support an application of the objective standard to all cases where the supervisor herself engaged in concerted activity, regardless of whether the supervisor's discharge had a direct or indirect effect on employees' statutory rights. The question whether *Parker–Robb* governs such cases is not before us, as it is undisputed that Helen Chizmar did not become involved in her relatives' organizational activities.

*Golub Brothers Concessions*, 140 NLRB 120 (1962)).[8] The Board distinguished retaliatory discharges from the "pattern of conduct" cases it overruled in *Parker–Robb* on the ground that supervisors in the former class of cases "had not engaged in any union activity." 280 NLRB at 1186. In addition, in analogizing retaliatory discharge cases to the exceptions enumerated in *Parker–Robb*, the Board indicated that retaliatory discharges of relative-supervisors have as deleterious an effect on employees' protected activities as · do discharges of supervisors for their refusal to commit unfair labor practices. *Id.* at 1185–86.

The Court of Appeals for the Seventh Circuit agreed, stating that "[t]o retaliate against a man by hurting a member of his family is an ancient method of revenge, and is not unknown in the field of labor relations." 823 F.2d at 1088. Having accepted the Board's determination that retaliatory discharges warranted an additional exception to the *Parker–Robb* rule, the court affirmed because the record supported the Board's finding that the employer's explanation for the discharge was pretextual. In doing so, the court implied that inquiries into the employer's motivation for

the discharge are permissible in cases falling within a *Parker–Robb* exception.[9]

This analysis was consistent with other post-*Parker-Robb* decisions involving 8(a)(1) violations predicated upon the employer's discharge of supervisory personnel. In *Oakes Machine Corporation, A Subsidiary of Katy Industries, Inc.*, 288 NLRB No. 52, a supervisor was discharged because of his stated intention to testify on behalf of a discharged employee who had independently contacted county health officials to complain about allegedly unsafe levels of radioactivity in his work area. Although the Board decided that the *employee* had no recourse under section 8(a)(1) because he had not acted in concert with other employees when he contacted the health officials, the Board found that the *supervisor's* discharge violated 8(a)(1) because it was motivated in part, by a clearly unlawful objective. The Board reached this conclusion, notwithstanding the fact that the ALJ had credited the employer's testimony that a "concurrent" reason for the discharge was the supervisor's inability to control employees under his supervision. The Board stated:

[g]iven the fact that the [employer's] action was motivated in part by a reason which we find unlawful under the fore-

---

8. The supervisor in *Advertising Manufacturing Co.*, was terminated two days after her son was elected chief shop steward. The employer alleged that numerous deficiencies in the supervisor's job performance justified her discharge. The ALJ, however, discounted the employer's evidence as pretextual. In support of his finding of a retaliatory discharge, the ALJ pointed to "the timing of the discharge [and] the lack of any legitimate reason or justification therefor." 280 NLRB at 1203. The ALJ also recited that "coincidental acts of retaliation against" protected employees proved that the supervisor's discharge formed part of a "pattern of conduct" aimed at unlawfully interfering with the employees' Section 7 rights. *Id.* As the Board noted in its affirmance, the ALJ's decision was unenforceable insofar as it purported to rely on "pattern of conduct" cases overruled in *Parker–Robb*. *Id.* at 1185.

9. Kenrich maintains that *Advertisers Mfg.* "demonstrates the proper application of the objective standard adopted in *Parker–Robb*." Brief at 23. As Kenrich observes, the employer in *Advertisers* did not claim that the discharge was necessi-

tated by the supervisor's conflict of loyalties; instead, it pointed only to alleged deficiencies in the supervisor's job performance, evidence which was discounted by the ALJ as an outright fabrication. Once the employer's purported reasons for the discharge were discredited, the sole remaining explanation for the discharge was the employer's unlawful endeavor to intimidate union supporters. *Advertisers*, 823 F.2d at 1088. Thus, Kenrich argues, the employer failed to establish a legitimate objective basis for the discharge as required by *Parker–Robb* and was properly held liable for its violation of section 8(a)(1).

We are unpersuaded by Kenrich's argument, as it relies on a strained reading of the Court of Appeals' language in *Advertisers*. The fact that the employer's evidence was deemed insufficient to substantiate its claimed justification for the discharge does not mean that the court applied an objective test when analyzing the discharge. Moreover, the court expressly stated that it was not relying on *Parker–Robb:* "The company argues that *Parker–Robb* should control the present case. It reads too much into *Parker–Robb*." *Id.*

going exception to the *Parker–Robb Chevrolet* rule, it was incumbent on the [employer] to establish by a preponderance of the evidence that it would have fired [the supervisor] even if he had not threatened to testify on [the employee's] behalf ... We think that [the employer] failed to meet that burden.... [B]oth lawful and unlawful grounds motivated the [employer]. Although the judge found that the lawful reason was 'primary,' still in light of *Wright Line* the [employer] could not prevail without an additional showing that that reason alone would have prompted [the supervisor's] discharge. [citations omitted.]

*See also Keith Austin, Inc.,* 288 NLRB No. 72 (1988) (finding no violation of section 8(a)(1) because credible evidence supported employer's claim that its sole motivation for discharging the supervisor was her incompetence).

■■■■ The Board's analysis of cases involving discharges of supervisory personnel can be summarized as follows. As a general rule, a supervisor's discharge cannot serve as a predicate for an unfair labor practice because supervisors are unprotected by the Act. Accordingly, in most cases, the Board will not consider the employer's subjective intent in discharging the supervisor because, given the Act's exclusion of supervisors from the class of protected persons, the employer's motivations are irrelevant. *See, e.g., Pontiac Osteopathic Hospital,* 284 NLRB No. 51 (1987) (holding that employer has a right to discharge supervisor for expressing her disapproval of unlawful discharge of statutory employee where employer did not coerce supervisor into participating in any of its unfair labor practices); *Crouse–Hinds Co., a Division of Cooper Industries,* 273 NLRB 333

(1984) (holding that employer could freely discharge supervisor because of conflict of loyalties created by his business partnership with known union organizer).[10]

■■ Cases falling within recognized exceptions to the *Parker–Robb* rule are analyzed in the same manner as any discharges alleged to violate section 8(a)(1). The General Counsel bears the burden of persuasion that "an antiunion animus contributed to the employer's decision to discharge [the] employee." *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983) (approving *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083, 105 L.R.R.M. 1169 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). Once a prima facie case is established, the burden shifts to the employer to prove by a preponderance of the evidence that it would have discharged the employee even absent its unlawful motivation. *Transportation Management,* 462 U.S. at 400, 103 S.Ct. at 2473. In meeting its burden of proof, the employer need not rebut the General Counsel's evidence of antiunion animus; the employer's burden is more in the nature of an "affirmative defense." *Id.*

■■ This being the standard, the Board did not err when it adopted the ALJ's decision. Kenrich's antiunion animus at the time of Chizmar's discharge was amply demonstrated by Monte's admission that he felt "betrayed" when he learned of the employees' decision to unionize, by Bernicker's comment that Monte discharged Chizmar because he "was not going to put up with any union bullshit," and by Monte's later statement to Union negotiators that

**10.** Kenrich suggests that the instant case is analogous to *Crouse–Hinds* because both involved irreconcilable conflicts of loyalty which compelled the supervisor's termination. Brief at 26. *Crouse–Hinds* is inapposite, however, because the basis for the decision was the ALJ's determination, affirmed by the Board, that a supervisor's termination for his refusal to sever a business relationship with a protected employee is not so inherently destructive of the employee's rights as to warrant an exception to the

*Parker–Robb* rule. 273 NLRB at 337. The ALJ distinguished the case from cases involving terminations of supervisors' spouses reasoning that in the latter situation, the protected employee is threatened not only with loss of his spouse's income, but is placed in a position where his union activities may jeopardize his marriage. *Id.* at 339 ("something more than an economic relationship is part of the underlying rationale in the supervisor spouse case," namely, "the husband-wife relationship").

he intended "to get rid of the whole [Chizmar] family."

Under *Wright Line*, General Counsel's establishment of its prima facie case caused the burden to shift to Kenrich to prove, by a preponderance of the evidence, that Helen Chizmar was discharged because of the irreconcilable conflict of loyalties she would experience if her relatives unionized. While it is probable that a reasonable employer would have discharged Chizmar under such circumstances, Kenrich failed to prove that Chizmar's anticipated conflict of loyalties in fact contributed to its discharge decision. Unlike the employer in *Crouse–Hinds*, which had openly objected to a supervisor's business partnership with a known union organizer, Kenrich officials kept to themselves any misgivings they had over Chizmar's ability to supervise her relatives. Monte made no reference to Chizmar's alleged conflict when he discharged her or when he later attempted to rationalize his decision to Catherine Chizmar. Indeed, it appears that Monte's apprehension about Chizmar's loyalty to Kenrich first surfaced at the hearing before the ALJ. Although, as Kenrich suggests, it might have been futile to raise the issue with Chizmar herself, as she hardly could dissolve the family relationships which gave rise to the alleged conflict, Kenrich could not prevail without adducing some credible evidence that it acted from proper motives.

Moreover, the timing of Helen Chizmar's discharge is highly suspect. Chizmar was terminated on May 29, 1987, practically three weeks before Kenrich's offer voluntarily to recognize the union. Thus, at the time of the discharge, Kenrich officials apparently believed that they still might defeat the union. In fact, the meeting wherein Monte attempted to dissuade McNally, Bobb, and Catherine Chizmar from joining the union occurred on June 3, 1987, just a few days after Helen Chizmar's termination. Although Kenrich probably is correct in its assertion that it did not have to wait until Chizmar actually compromised her duty of loyalty to Kenrich, the fact that the termination occurred at such an early stage of the union campaign casts considerable doubt on Kenrich's defense.

Contrary to Kenrich's suggestion, the ALJ's application of the *Wright Line* "mixed motive" test did not lead inexorably to his finding of an unfair labor practice. If Kenrich had substantiated its claim that Chizmar's conflict of loyalties contributed to the discharge decision then, under *Wright Line*, Kenrich would have prevailed. Absent such proof, the Board and the ALJ certainly were justified in finding that Kenrich's belated explanation for the discharge was pretextual and Kenrich's sole intent was to retaliate against Chizmar's relatives for attempting to unionize. Accordingly, we agree with the Board's finding of an 8(a)(1) violation.

### Remedy Regarding Helen Chizmar

■ We do not reach a similar conclusion with respect to the Board's selection of remedy because we fail to see how Chizmar's reinstatement with backpay serves any legitimate remedial purpose. Instead, we conclude that the Board exceeded its remedial authority and stepped beyond the permissible boundaries of the Taft–Hartley Act in seeking to recompense a supervisor for Kenrich's unlawful attempt to thwart the union's organizational campaign.

■ The Board's remedial powers derive from section 10(c) of the Act, 29 U.S.C. § 160(c), which empowers the Board to "tak[e] such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." Although the Board has "wide discretion" in fashioning remedies for unfair labor practices, *Virginia Electric and Power Co. v. NLRB*, 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943), and the Board's selection of remedy is entitled to considerable judicial deference, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969), appellate courts need not rubber-stamp a remedial order which is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *NLRB v. R.H. Rut-*

*ter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969).

In reviewing the propriety of the Board's order, we are not constrained by our own precedent as we have not conclusively answered the question of whether the Board has the power to order a supervisor's reinstatement. In *Hi–Craft Clothing Co. v. NLRB*, 660 F.2d at 910, we denied enforcement of a Board order compelling the reinstatement of a supervisor who was dismissed when he threatened to institute a Board action against his employer based on a personal grievance. In that case, however, the interests of rank and file employees were not ever at stake and thus the opinion is not conclusive here. Nevertheless *Hi–Craft* is significant as we viewed the question of whether a supervisory employee could be reinstated as "a case of straightforward statutory construction." *Id.* Of course, in view of the Taft–Hartley Act we had no difficulty in concluding that the supervisor could not be ordered reinstated. *Id.* at 918.

We acknowledge, however, that other courts of appeals have enforced reinstatement orders on the theory that reinstatement of an unlawfully discharged supervisor tends to "dissipate the effects of an unfair labor practice and restore the status quo." *NLRB v. Talladega Cotton Factory, Inc.*, 213 F.2d 209, 217 (5th Cir.1954). *See also Delling v. NLRB*, 869 F.2d at 1397; *NLRB v. Advertisers Mfg. Co.*, 823 F.2d at 1086; *Howard Johnson Co. v. NLRB*, 702 F.2d 1, 6 (1st Cir.1983); *Belcher Towing Co. v. NLRB*, 614 F.2d 88, 91–92 (5th Cir.1980); *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 206–07, (8th Cir.1977). However, we shall not attempt to harmonize our decision with the above cases because they involved fact patterns which are substantially different from the situation here.

As in all cases, the remedy selected by the Board must "effectuate the policies of [the Act]," 29 U.S.C. § 160(c), that is, it must redress the type of harm the Act was meant to prevent. Although the Board, in exercising its remedial power, may do more than make employees whole for monetary losses suffered on account of an unfair labor practice, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 193, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1940), the remedy chosen still must, in some way, "safeguard[ ] and encourage[ ] the right of self-organization." *Id.* In this case, because Helen Chizmar was fired in retaliation for the organizing activities of her relatives, we believe that the propriety of the Board's reinstatement order must be tested in the context of an organizational campaign. As Kenrich puts it, the remedy was permissible only if it was needed "to restore the employees' organizational rights." Letter Brief at 12.

Viewed in this light, it is difficult to see how Chizmar's reinstatement with back pay could serve any legitimate remedial purpose. Chizmar was terminated on May 29, 1987, and, on June 16, the Company offered to recognize the bargaining unit. After the employees rejected that offer, an election was held on July 2 in which the union prevailed. Following the union's certification on August 11, Kenrich and the union began negotiating a collective bargaining agreement. Thus, any coercive effect Chizmar's discharge may have had on the employee's organizational efforts is not apparent from the record. Indeed, it would defy common sense to hold that it is necessary to reinstate Helen Chizmar to correct the effects of the unfair labor practice. Her reinstatement would be meaningless in that respect but would frustrate the policy of the Act with respect to supervisory employees.

While we appreciate the narrow scope of our review of the Board's remedial orders, *Louton*, 822 F.2d at 414, we would be abdicating our responsibility if we approved the Board's remedy in this case. Chizmar's discharge simply did not undermine the union's support as it prevailed in the election and even if it had not the Board could have remedied the situation by ordering a new election or by issuing a bargaining order. *NLRB v. Gissel Packing Co.*, 395 U.S. at 612–15, 89 S.Ct. at

1939–40.[11] Instead, in ordering Chizmar's reinstatement, the Board selected a remedy which conferred benefits flowing exclusively to a supervisor and as such, exceeded its remedial power. *See Hi–Craft Clothing,* 660 F.2d at 918 ("When only the supervisor's interests are at stake, . . . the intent of the Taft–Hartley Amendments is to deny jurisdiction to the Board.").

We express no opinion as to whether in some future case, the Board might be justified in ordering a supervisor's reinstatement with back pay. Where a supervisor is dismissed for refusing to commit an unfair labor practice, it may very well be that the supervisor's reinstatement is the only means by which the Board can adequately safeguard employees' rights. *See, e.g., Delling,* 869 F.2d at 1399–1400 (refusal to falsify termination slips in furtherance of employer's attempt to establish a pretext for unlawful discharges of statutory employees); *Howard Johnson Co. v. NLRB,* 702 F.2d at 6 (refusal to engage in unlawful surveillance of union activity). However, in view of the Taft–Hartley amendments, we are compelled to scrutinize closely an order of reinstatement of a supervisor lest we frustrate the intention of Congress.

■ Our unwillingness to enforce the Board's order in this respect should not be construed to mean that we tacitly approve of Kenrich's conduct or that we lack sympathy for Helen Chizmar's plight. But where, as here, an order does not serve any legitimate remedial purpose under the Act, we are constrained to regard it as an unauthorized attempt to impose punitive sanctions on the employer. *See Republic Steel Corp. v. NLRB,* 311 U.S. 7, 10–11, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940). *See generally Deboles v. Trans World Airlines, Inc.,* 552 F.2d 1005, 1019 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977) (" 'it is the general policy of the federal labor laws . . . to supply remedies rather than punishments' ") (citations omitted). Accordingly, we deny enforcement of that portion of the Board's order compelling Helen Chizmar's reinstatement with back pay.

### Assault of Barbara Knorowski

The Board accepted the ALJ's determination that Kenrich violated section 8(a)(1) of the Act when, on June 18, Monte intentionally assaulted Barbara Knorowski because of her union activities after she attempted to express her condolences for his father's death. On appeal, Kenrich insists that Monte rejected Knorowski's condolences for personal reasons unrelated to the union campaign and that any physical contact between Monte and Knorowski was inadvertent. Kenrich points out that Monte made no reference to Knorowski's union activities during the "alleged" assault; he mentioned the union only after the plant shop steward, McClean, arrived at the behest of Catherine Chizmar. Thus, Kenrich argues, the confrontation between Monte and Knorowski cannot possibly be construed as an unfair labor practice and the ALJ's finding that Monte's conduct violated section 8(a)(1) should be set aside as unsupported by substantial evidence. Brief at 33.

■ If we were free to engage in a *de novo* review of the record, we might well agree with Kenrich because we could reasonably infer that Monte's extreme reaction to Knorowski's expression of condolences was caused by his bereavement over his father's death rather than his antiunion animus. However, as a reviewing court, we must sustain the Board's factual inferences if they are supported by substantial evidence even though, acting *de novo,* we might have reached a different conclusion. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Hunter Douglas, Inc. v. NLRB,* 804 F.2d 808, 812 (3d Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987).

---

11. The Supreme Court explained in *Gissel* that a bargaining order is appropriate where the employer, through pervasive unfair labor practices, has so "undermine[d] a union's strength" that "the only fair way to effectuate employee rights is to reestablish . . . conditions as they existed before the employer's unlawful campaign." *Id.* 395 U.S. at 612, 89 S.Ct. at 1939.

■ Here, the ALJ found it "highly relevant" that Monte himself admitted that he rejected Knorowski's condolences because he was angered by her attempt to persuade Linda Ferrino to join the union. App. at 707. Although no reference was made to the union during the assault, Monte's admission provided a sound basis for the ALJ's inference that the assault was motivated by antiunion animus. As Monte is Kenrich's President, his antiunion animus certainly can be imputed to Kenrich, especially in view of the fact that no Kenrich official made any attempt to repudiate his conduct. *See Graves Trucking, Inc. v. NLRB*, 692 F.2d 470, 473–74 (7th Cir.1982). Furthermore, the physical contact between Monte and Knorowski cannot fairly be described as inadvertent as the parties stipulated that the hallway was so narrow that two individuals could not pass through it without one stepping aside. In such circumstances, the ALJ was justified in concluding that "[t]he only reasonably foreseeable result of Monte's actions [was] that Knorowski would be propelled into the filing cabinets." App. at 707–08.

Thus, while, Monte's derogatory comments about the union *after* the incident could not, in themselves, transform a personal encounter with Knorowski into an unfair labor practice, his testimony that the incident was attributable to Knorowski's concerted activity and the purposeful nature of his physical contact with Knorowski, provide substantial evidence in support of the Board's finding of an 8(a)(1) violation.

*Causing Catherine Chizmar and Barbara Knorowski to be Absent from Work and Laying Off Knorowski*

The ALJ found that Kenrich committed two independent unfair labor practices under sections 8(a)(1) and (3) when Kenrich, through Monte's abusive conduct on June 18, caused Catherine Chizmar and Knorowski to suffer debilitating "psychiatric injuries," and when it placed Knorowski on indefinite layoff following her disability leave for psychiatric treatment. Kenrich asserts that the Board erred in adopting the ALJ's causation finding with respect to the first unfair labor practice because the ALJ impermissibly speculated as to the source of the employees' emotional disturbances in the absence of competent medical evidence. Brief at 38–39. Kenrich also complains that the ALJ's denial of its request for prehearing discovery precluded it from adequately preparing its defense. *Id.* at 40.

■ We reject both of the above contentions and deny review of the Board's decision that Kenrich unlawfully caused Catherine Chizmar's and Knorowski's illnesses. We also summarily deny review of the Board's decision with respect to Knorowski's layoff, as Kenrich appears to concede that if it unlawfully caused Knorowski's absence from work, then its refusal to offer her immediate reinstatement also was unlawful. *Id.* at 42.[12]

■ According to Kenrich, the injuries suffered by Catherine Chizmar and Knorowski presented "complex medical issues of causation" which could not be resolved without expert medical testimony. Kenrich relies on *Bushman v. Halm*, 798 F.2d 651, 659 (3d Cir.1981), wherein we opined that an expert opinion is required to prove medical causation "[i]f the question ... is so esoteric that lay minds cannot form any intelligent judgment about it without ex-

---

12. Even absent Kenrich's concession, we would deny review because Kenrich raises only factual issues with regard to Knorowski's layoff, and we believe that the Board's decision on this issue was supported by substantial evidence. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465. Kenrich alleges that it failed to reinstate Knorowski not because of antiunion animus but because she had failed to apprise Kenrich of her expected return date and no clerical positions were available when she appeared for work on November 2, 1987. Although Knorowski was somewhat lax in informing Kenrich about her plans and therefore, under normal circumstances, Kenrich could not be faulted for failing to preserve a position for her, the circumstances of Knorowski's disability were not normal. The Board was certainly justified in accepting the ALJ's conclusion that the onus was on Kenrich to accommodate Knorowski, given that it unlawfully caused her absence from work.

pert aid." [13] We noted, however, that in other cases, "circumstantial evidence or common knowledge may provide a sound basis from which a causal sequence may be inferred." *Id.* The need for an expert opinion thus hinges on the factfinder's "ability to make a rational inference that accident and injury are related." *Id.* at 658.

It is true that medical judgments lie beyond the scope of the Board's expertise and therefore, under the substantial evidence test, they should be set aside if the Board's medical conclusions were based on sheer speculation. *Universal Camera*, 340 U.S. at 488–90, 71 S.Ct. at 464–66; *Sioux Quality Packers, Div. of Armour & Co. v. NLRB*, 581 F.2d 153, 157 (8th Cir.1978). However, in this case, the Board, in adopting the ALJ's finding of causation, did not speculate, as that finding was based largely on medical reports prepared by the employees' physicians, on insurance forms completed by Knorowski's psychiatrist, and on the "disability certificates" issued by Kenrich's own physician, Dr. Williams.

Although there was no direct medical evidence that Monte's conduct caused the maladies, the ALJ rationally inferred that Monte was responsible since all of the examining physicians, including Dr. Williams, agreed that the illnesses began on the same day as his barrage of verbal abuse. Kenrich's sole complaint seems to be that the ALJ made his findings without hearing any live expert testimony. Because we are aware of no cases remotely suggesting that written reports are an insufficient basis for medical findings in an agency adjudication, the ALJ's resolution of the causation question must stand, as it was a rational inference from competent medical evidence and as such was based on substantial evidence. *Universal Camera*, 340 U.S. at 488–90, 71 S.Ct. at 464–66; *Sioux Quali-*

*ty Packers, Div. of Armour & Co. v. NLRB*, 581 F.2d at 157.

Kenrich's second complaint, regarding the ALJ's denial of its discovery request, requires little discussion. In its request, Kenrich sought access to any medical reports prepared by experts retained by General Counsel, and the opportunity to depose any witnesses, including the employees, who General Counsel intended to call at the hearing. App. at 33–34. The ALJ denied Kenrich's request on the ground that the Board's procedural rules normally do not permit prehearing discovery, except for good cause. App. at 38.[14] As the ALJ explained, the good cause exception is limited to instances where discovery is needed "for the preservation of evidence, usually because the witnesses will not be available to testify at the hearing." *Id.*

Here, Kenrich did not meet the good cause exception as it did not specify in its motion any ground relating to the preservation of evidence. But even if the ALJ did abuse his discretion, the error was at most harmless, as General Counsel did not call any expert witnesses and Kenrich already had been provided with the employees' medical reports. Also, Kenrich had an opportunity to cross-examine the employees as to the extent and cause of their injuries. Finally, we note that neither the constitution nor the Administrative Procedure Act confer a right to discovery in federal administrative proceedings. *See NLRB v. Valley Mold Co.*, 530 F.2d 693, 695 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976) (no due process or APA requirement); *Frilette v. Kimberlin*, 508 F.2d 205, 208 (3d Cir.1974) (in banc), *cert. denied*, 421 U.S. 980, 95 S.Ct. 1983, 44 L.Ed.2d 472 (1975) (no requirement under the APA). Absent a showing of abuse of discretion or actual

---

13. The ALJ questioned Kenrich's reliance on *Bushman* because in that case we were primarily concerned with New Jersey tort law. However, as *Bushman* did contain an extensive discussion of evidentiary principles which would apply in any case involving issues of medical causation, Kenrich's reliance was not misplaced.

14. The Board rules provide that "witnesses shall be examined orally under oath, except that for good cause shown after the issuance of a complaint, testimony may be taken by deposition." 29 C.F.R. § 102.30.

prejudice, Kenrich's procedural challenge must fail.

### McPartlan's Discharge

 The ALJ determined that Kenrich violated sections 8(a)(1) and (3) of the Act when it discharged Karen McPartlan for resuming her part-time hours in September, 1987, notwithstanding Monte's instruction that she continue working full-time. The ALJ's decision depended largely on his earlier finding that Kenrich's elimination of the clerical workers' part-time hours served as predicate for an independent unfair labor practice.[15] Although the ALJ recognized that under "ordinary circumstances," McPartlan's disobedience would have justified her discharge, he reasoned that because the change in hours was itself unlawful, McPartlan's refusal to conform to her new schedule could not be considered insubordinate. App. at 716.

On appeal, Kenrich presses the same argument it did before the ALJ, namely that McPartlan's refusal to comply with Monte's instructions was insubordination in the form of self-help, and that her remedy lay with the Board. Brief at 47. In fact, as Kenrich points out, at the time of her discharge McPartlan already had filed a complaint with the Board protesting her change in hours. Given that McPartlan circumvented the Board's grievance procedures and unilaterally attempted to restore her part-time hours, Kenrich argues that her discharge cannot be considered violative of the Act.

Although this argument may have considerable force, we will not grant the petition for review or enforce the Board's order at this time but instead will remand the matter to the Board for reconsideration of both the lawfulness of McPartlan's discharge and the enforceability of its remedy that Kenrich restore her part-time hours, in view of the fact that the existing collective bargaining agreement does not provide for part-time employment. If the Board, upon reconsideration, again holds that McPartlan's discharge constituted an unfair labor practice and decides that the collective bargaining agreement does not preclude her part-time employment, it still will need to modify its remedy because it did not order McPartlan's reinstatement and, apparently, she no longer is employed at Kenrich.[16] As our doubts regarding the unlawfulness of McPartlan's discharge arise from the Board's holdings in cases which were not addressed in the ALJ's opinion, we feel it is appropriate to leave it to the Board to decide whether its finding of an unfair labor practice is consistent with its own precedent. We explain below the nature of our reservations.

 By its plain language, the NLRA does not preclude an employer for discharging a protected employee for just cause. See 29 U.S.C. § 160(c) ("No order ... shall require the reinstatement of any individual ... [who] was suspended or discharged for cause.") See also Evans St. Clair, 278 NLRB No. 65 (1986) (finding no 8(a)(3) violation where the employee was discharged for threatening supervisor during heated discussion over alleged unfair labor practices). Further, McPartlan's position as union shop steward did not immunize her from a lawful discharge. See NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 994 n. 5 (4th Cir.1979).

Even if the employees believe that their assigned tasks lie beyond the scope of their job responsibilities, the Board normally has

---

15. That finding has gone unchallenged in this appeal. Although Kenrich does not concede its guilt as to the change in work hours, it asserts that subsequent developments have rendered the issue moot. Brief at 6. Presumably, Kenrich refers to the fact that the collective bargaining agreement it negotiated with the union provides only for full-time employment. Id. at 48.

16. In his recommended order, adopted by the Board, the ALJ stated that it was not necessary to order McPartlan's reinstatement because Kenrich already had reinstated her to her former position. According to Kenrich, however, on July 5, 1988, which was after the hearing before the ALJ but before he gave his decision, McPartlan resigned from Kenrich due to her inability to work a full-time schedule, as required by the collective bargaining agreement. It is difficult to see how this resignation could be attributed to an unfair labor practice as the full time schedule was the product of negotiation between Kenrich and the union.

required them to satisfy their employer's demands and grieve later. As the Board wrote in *Audobon Health Care Center*, 268 NLRB No. 14 (1983), a case involving an unprotected "partial strike":

> [w]hile employees may protest and ultimately seek to change any term or condition of their employment by striking or engaging in a work stoppage, the strike or stoppage must be complete, that is, the employees must withhold all their services from their employer. They cannot pick and choose the work they will do or when they will do it. Such conduct constitutes an attempt by the employees to set their own terms and conditions of employment in defiance of their employer's authority to determine those matters and is unprotected.

268 NLRB at 137.

In view of the Board's strong condemnation of self-help in its "partial strike" precedent, we have doubts that McPartlan was privileged to disregard her change in hours. The language in *Audobon* seems to indicate that an employee engages in unprotected activity when she usurps her employer's prerogative to set the terms and conditions of employment, regardless of whether the employer's orders ultimately are found to be unlawful. If that is what the Board meant to hold in *Audobon*, then the unlawfulness of Kenrich's elimination of part-time hours might not have sanctified McPartlan's behavior at the time of the discharge.

We also question whether McPartlan engaged in "concerted activity" when she refused to comply with her full-time schedule. *See* 29 U.S.C. § 157. Although the participation of two or more employees is not a prerequisite for satisfaction of the Act's concerted activity requirement, *NLRB v. City Disposal Systems, Inc.*, 465

U.S. 822, 831, 104 S.Ct. 1505, 1511, 79 L.Ed.2d 839 (1984),[17] the Act still requires "some nexus" between the employee's conduct and "group action." *Ewing v. NLRB*, 861 F.2d 353, 361 (2d Cir.1988). *See also Prill v. NLRB*, 835 F.2d 1481, 1484 (D.C. Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988) (upholding Board rule in *Meyers Industries, Inc.*, 281 NLRB No. 118 that an individual worker's invocation of statutory safety standards is not concerted unless the worker acts on the authority of his fellow workers). Here, there is no evidence that McPartlan enlisted the support of her coworkers before she took the actions which resulted in her discharge. Thus, it appears that McPartlan acted alone for her own benefit.

In rejecting Kenrich's argument, the ALJ analogized McPartlan's termination to a constructive discharge, reasoning that because McPartlan would have been protected had she resigned due to her inability to work a full-time schedule, her "decision to remain on the job ... [did] not warrant a different result." App. at 717. While it is true that an employee who is constructively discharged as a result of an employer's unfair labor practices enjoys the same protection as an unlawfully discharged employee, there is a critical difference between this case and one involving a constructive discharge.

In the context of the Act, a constructive discharge occurs when an employee resigns in response to "intolerable conditions" created by the employer for the purpose of "discourag[ing] union activity or membership." *Cartwright Hardware Co. v. NLRB*, 600 F.2d 268, 270 (10th Cir.1979). *See also Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986),

---

**17.** In *City Disposal Systems*, the Court held that an employee engages in concerted activity when, without enlisting the aid of his fellow workers, he refuses to obey an order which he reasonably believes is inconsistent with rights grounded in a collective bargaining agreement. The Court reasoned that an employees' invocation of rights derived from the collective bargaining process is inherently "concerted" because he "brings to bear on his employer the power and resolve of all his fellow employees." *Id.* 465 U.S. at 832, 104 S.Ct. at 1511.

McPartlan's conduct clearly was not within *City Disposal Systems* because her claimed right to work a part-time schedule derived from a separate agreement she allegedly reached with Kenrich before the unionization of the clerical staff. Thus, McPartlan's co-workers played no part in securing the right McPartlan sought to enforce.

*cert. denied,* 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). We underscore the requirement that an employee claiming constructive discharge in fact resign and thereby remove herself from her employer's authority. Although Kenrich may have created an "intolerable situation" when it unlawfully changed McPartlan's work schedule, McPartlan's response to the violation differed materially from that of a constructively discharged employee, as she attempted to continue her employment under terms which she unilaterally selected. In doing so, she engaged in disobedience which would not have occurred had she treated her change in work hours as a constructive discharge.

Although it may seem anomalous to hold that a constructively discharged employee has greater protection under the Act than one who continues her employment, the Board's refusal to condone partial strikes indicates that an employee cannot retain the benefits of employment while refusing to submit to its burdens, based on his or her personal judgment that the employer acted improperly when issuing a particular order. Accordingly, we feel that further consideration of Kenrich's liability is necessary in light of both *Audobon* and the Act's concerted activity requirement.

For the foregoing reasons, the petition for review will be granted in part and denied in part and the order of May 31, 1989, will be enforced in part and denied enforcement in part, and the Board's decision with regard to Karen McPartlan's discharge will be remanded for reconsideration of Kenrich's liability and the Board's selected remedy. The parties will bear their own costs in this court.

STAPLETON, Circuit Judge, concurring and dissenting:

I join all of the court's opinion other than the section entitled "Remedy Regarding Helen Chizmar." I respectfully dissent from the views there expressed.

The majority appears to hold that when an employer fires a supervisor for the purpose of coercing protected employees in the exercise of their rights under the Act, the Board is without power to order reinstatement and backpay of the supervisor absent a showing that the employees have failed to successfully exercise their rights in some specific manner. I believe this view does justice neither to the myriad of circumstances in which such coercion can be applied nor to the many subtle ways in which such coercion can fail in its principal objective and nevertheless take a substantial toll on employee rights under the Act. The fact that the union's organizational efforts were successful here does not necessarily mean that the discharge did not intimidate the employees during the election or that they will not be intimidated by it in the future.

As the only other Court of Appeals to consider this precise issue has concluded, the Board is entitled to conclude that this kind of conduct in the overall context of a particular case poses such a substantial risk of suppressing the exercise of employee rights that the status quo must be restored. See *NLRB v. Advertisers Manufacturing Co.* 823 F.2d 1086 (7th Cir.1987) (reinstatement remedy upheld despite the success of the employees efforts to unionize).[1] I, too, am persuaded that there will be situations in which nothing less than the supervisor's reinstatement with backpay

---

1. I disagree also with the majority's implication that this case materially differs from the numerous decisions approving the reinstatement of supervisors who were fired for refusing to commit unfair labor practices and for testifying in Board proceedings. *See, e.g., Howard Johnson Co. v. NLRB,* 702 F.2d 1, 6 (1st Cir.1983) (reinstatement remedy upheld despite supervisor's refusal to commit unfair labor practice by informing on employees); *cf. Local No. 207, International Assoc. of Bridge Workers v. Perko,* 373 U.S. 701, 707, 83 S.Ct. 1429, 1432, 10 L.Ed.2d 646 (1963) (recognizing Board's authority to order reinstatement of supervisor discharged for refusing to engage in unfair labor practice). The employees in these decisions were not directly injured by the supervisor's dismissal precisely because the supervisor refused to further the employer's unlawful scheme. Rather, the courts have reasoned that these employees would not likely fully exercise their rights in the future if employers could freely discharge supervisors who assisted in the defense of protected rights. Chizmar's reinstatement would protect the very same interest.

will protect the rights bestowed upon the employees by the Act. I would defer to the Board's judgment that this is such a case.

Present: A. LEON HIGGINBOTHAM, Jr., Chief Judge, and SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD and GARTH, Circuit Judges.

### ORDER SUR PETITION FOR REHEARING

The NLRB has filed a petition for rehearing in banc "insofar as the panel majority declined to enforce the Board's order requiring Supervisor Helen Chizmar reinstated with back pay." A majority of the active judges of the court have voted for rehearing in banc as to Helen Chizmar. A rehearing in banc is hereby granted solely on the issue of whether the Board's order should be enforced as to Helen Chizmar. Solely as it pertains to Helen Chizmar, the panel's opinion is vacated at 893 F.2d 1480–1482, and we stay the entry of any judgment.